CC-2001-662                                        1

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Lillian E. Medina Hernández<br><br>Acusada-peticionaria | Certiorari<br><br>2003 TSPR 8<br><br>158 DPR \_\_\_\_ |

Número del Caso: CC-2001-662

Fecha: 5 de febrero de 2003

Tribunal de Circuito de Apelaciones:
                    Circuito Regional IV

Juez Ponente:
                    Hon. Roberto L. Córdova Arone

Oficina del Honorable Procurador General:

                    Hon. Roberto J. Sánchez Ramos
                    Procurador General

                    Lcda.Yasmín Cháves Dávila
                    Procuradora General Auxiliar

Abogados de la Parte Peticionaria:

                    Lcdo. Luis A. Pérez Bonilla
                    Lcdo. Edwin H. flores Sellés
                    Lcdo. Federico Rentas Rodríguez
                    Lcdo. Luis F. Abreu Elías

Materia: Asesinato en Primer Grado y Ley de Armas (Artículos 6 y 8)

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Recurrido

        vs.                   CC-2001-662  CERTIORARI

Lillian E. Medina Hernández

    Acusada-peticionaria

Opinión del Tribunal emitida por el Juez Asociado SEÑOR REBOLLO LOPEZ

San Juan, Puerto Rico, a 5 de febrero de 2003

Lillian Enid Medina Hernández, aquí peticionaria, recurre ante este Tribunal --vía certiorari-- en revisión de la sentencia emitida por el Tribunal del Circuito de Apelaciones, confirmatoria la misma de una resolución del Tribunal de Primera Instancia, Sala Superior de Aguadilla; mediante la misma el foro primario denegó una moción de supresión de evidencia donde se había solicitado la exclusión de toda confesión, admisión, testimonio y/o prueba derivada de los interrogatorios realizados a Medina Hernández durante el curso investigativo del caso. A tales efectos aduce la peticionaria que no medió una renuncia libre,

voluntaria e inteligente a su derecho a no autoincriminarse.

I

Repasamos los hechos pertinentes a la controversia planteada, según fueran determinados por el Tribunal de Primera Instancia luego de haber considerado toda la evidencia testifical y documental presentada.[1]

El 19 de noviembre de 2000 --entre las 8:00 y 9:00 de la noche-- el señor Antonio Medina Sepúlveda, padre de la peticionaria Lillian Enid Medina Hernández, arribó a su residencia, en unión de una hija menor de edad de nombre Lillibeth, encontrando el portón y la puerta del balcón abiertos. Mientras estacionaba su automóvil, su hija Lillibeth entró a la residencia, saliendo inmediatamente de la misma para informarle que su mamá aparentemente se había caído. Al encontrarse con el cuerpo de su esposa tirado en el suelo, y tras haber verificado el pulso y respiración de ésta, el señor Medina llamó a emergencias médicas.

A raíz de esta llamada llegaron al lugar de los hechos la agente Magali Souchet, adscrita al Negociado de

---

[1] Con el fin de presentar una exposición de hechos más completa hemos tenido a bien utilizar la transcripción de la vista de supresión de evidencia que fuera sometida por la peticionaria, Lillian Enid Medina Hernández, en su alegato ante nos. La referida transcripción fue presentada con la aquiescencia del Procurador General, luego de haber sido evaluada y aceptada por el fiscal que intervino en la vista de supresión de evidencia.

Crímenes Violentos, y el Fiscal Joseph Esparra. A tenor con el testimonio de éstos, a los cuales el Tribunal de Primera Instancia le dio entero crédito, en la habitación donde se encontró a la occisa no se observaron signos de violencia, aunque sí se observó que ésta tenía un impacto de bala en la cabeza y una toalla alrededor de su cuello.[2] En una de las paredes del pasillo aparecía escrito con lápiz de labio: "Lillian te voy a matar con lo que robaste a tu papá." Del mismo modo, en la habitación de la peticionaria aparecía escrito sobre el espejo de la coqueta un mensaje que leía: "Lillian tienes suerte cuídate". En virtud de las referidas amenazas, la agente Souchet entendió conveniente ocupar una libreta que estaba tirada sobre la cama de Lillian[3]; ello, según testificó, con el único fin de indagar si de ésta surgía alguna información en cuanto a si alguien deseaba hacerle daño a la peticionaria.

Tras permanecer en la escena hasta aproximadamente las dos de la madrugada (2:00 a.m.) del día <u>20 de noviembre de 2000</u>, la agente Souchet se trasladó al Cuartel de la Policía de Aguada donde, más tarde,

---

[2] Véase: Transcripción de la Vista de Supresión de Evidencia, a la pág. 13; Petición de Certiorari, Apéndice XIV, a la pág. 443.

[3] En ese momento Lillian aún no se encontraba en la residencia. Ésta se encontraba en una actividad de la escuela en la plaza de recreo de Aguada. A eso de las 10:30 de la noche la joven llamó para que la fueran a buscar.

entrevistó al señor Medina y a sus hijas Lillian y Lillibeth.[4] Es en esta entrevista en que la agente adviene en conocimiento de que Lillian --quien en esos momentos contaba con quince años de edad[5]-- alegadamente había tenido problemas en la escuela con un joven llamado Will, por ésta haber informado a las autoridades escolares que éste se dedicaba a vender sustancias controladas en el plantel escolar. También surgen por primera vez los nombres de Tatiana, Christian y Ezer, identificados como amigos de Lillian Enid. Finalmente, el señor Medina le informó a la agente que éste poseía dos armas de fuego y que para una de ellas no tenía licencia. Ésta, según informó, había desaparecido de su automóvil, situación de la cual se percató la noche de los hechos. De acuerdo con los testimonios de Medina Sepúlveda y de la agente Souchet estas entrevistas duraron sólo varios minutos, tras los cuales el señor Medina se trasladó con sus hijas a la casa de su madre en Añasco.

Movida por las amenazas escritas observadas en la residencia de la peticionaria, esa misma tarde del 20 de

---

[4] Véase: Transcripción de la Vista de Supresión de Evidencia, a la pág. 16; Petición de Certiorari, Apéndice XIV, a la pág. 446.

[5] Conforme establece el Artículo 2 de la Ley de Menores, 34 L.P.R.A. sec. 2204, el Tribunal de Menores no tendrá autoridad para conocer de un caso en que se impute a un menor que hubiere cumplido quince (15) años de edad la comisión de hechos constitutivos de asesinato en primer grado mediante deliberación y premeditación. Al momento de la comisión de los hechos, esto es, el día 19 de noviembre de 2000, la peticionaria, Lillian Enid Medina Hernández, ya había cumplido la edad de quince (15) años.

noviembre de 2000 la agente Souchet obtuvo en el cuartel de Aguada copia de un informe de querella donde la occisa había reportado la desaparición de Lillian y había informado que ésta había sido vista con el joven Ezer Muñiz. En la mañana del 21 de noviembre --segundo día de la investigación-- fueron entrevistados varios vecinos de la occisa, algunos compañeros de estudios de Lillian, la orientadora de la escuela y la directora del plantel escolar.[6] Ni Lillian ni su padre fueron entrevistados durante este segundo día de investigación.

El 22 de noviembre, día pautado para el entierro de la señora Lidia Hernández Soto, la agente Souchet, en compañía de varios agentes de la División de Crímenes Violentos, se personó a la funeraria donde velaban a la occisa con el propósito de brindar seguridad y protección a la familia.[7] Justo en el momento en que el cortejo fúnebre se disponía a partir hacia la iglesia[8], Lillian pidió que le informaran a su tía Felipa, hermana de su papá, que "quería hablar". La tía Felipa condujo a Lillian hasta el vehículo donde se encontraba la agente Souchet,

---

[6] Los compañeros de clase entrevistados fueron: Will, Tatiana y Christian.

[7] Lo cual parece procedente al considerar las amenazas que existían en contra de Lillian.

[8] De acuerdo con testimonio de la agente Souchet, el cortejo fúnebre se disponía a partir a eso de las 2:30 p.m. Transcripción de la Vista de Supresión de Evidencia, a la pág. 20; Petición de Certiorari, Apéndice XIV, a la pág. 450.

indicándole a ésta que su sobrina deseaba hablar con ella.[9]
Acto seguido ambas subieron al vehículo y se dirigieron,
junto a la agente a la Comandancia de Aguadilla.

Una vez allí, Lillian comenzó a dialogar con la
agente Souchet[10], informándole que Will, quien le
suministraba sustancias controladas, y con quien tenía una
deuda de dinero, podía ser el asesino de su madre.
Inmediatamente la agente se comunicó con el Fiscal Esparra
y le informó que tenía a un menor sospechoso. El fiscal, a
su vez, se comunicó con la Procuradora de Menores, la
licenciada María del C. Aymat, acordando que se reunirían
después de las cuatro de la tarde (4:00 p.m.) en la
oficina de la mencionada Procuradora. Alrededor de las
4:30 p.m., se reunieron el Fiscal Esparra, la agente
Souchet, Lillian y su tía en la Oficina de la Procuradora.
Esperaron a que llegara el padre de Lillian, que estaba en
el sepelio de su esposa. Éste se personó en la oficina
aproximadamente de 5:45 p.m. a 6:00 p.m.

---

[9] Al ser informada de que Lillian quería hablar, la agente
Souchet le preguntó: "Lillian que me quieres decir", a lo
que la peticionaria respondió: "Magali, yo quiero hablar
contigo, yo quiero hablar contigo." Transcripción de la
Vista de Supresión de Evidencia, a la pág. 21; Petición de
Certiorari, Apéndice XIV, a la pág. 451.

[10] A pesar de que en ese momento habían otros agentes en el
cuartel, ninguno de ellos presenció la conversación
sostenida entre la agente Souchet y Lillian. Sólo las
acompañaba la tía de la menor, la señora Felipa Medina
Sepúlveda. Transcripción de la Vista de Supresión de
Evidencia, a la pág. 72; Petición de Certiorari, Apéndice
XIV, a la pág. 501.

A esa hora --entre 5:45 p.m. y 6:00 p.m.-- la Procuradora procedió a entrevistar a Lillian, quien relató que tenía un vicio de sustancias controladas y que Will le "fiaba" la droga. Adujo que éste constantemente le cobraba la deuda incurrida, razón por la cual ella había decidido enfrentarse a él, utilizando para ello un arma de fuego que había tomado del vehículo de su padre. Según atestó, Will robó de su bulto la referida arma. Finalmente, indicó que sospechaba que Will, en represalia contra ella, había matado a su mamá.

Tras escuchar el testimonio de Lillian, la agente Souchet abandonó la oficina de la Procuradora dirigiéndose a la casa de Will.[11] A su regreso, la agente se dirigió a la Oficina de la Procuradora Aymat ya que el Fiscal Esparra aún se encontraba con Lillian y sus familiares en dicha oficina, informándole al fiscal que Will ya se encontraba en el cuartel. Acto seguido, Lillian manifestó que lo que había dicho acerca de Will no era cierto. Ésta permaneció en silencio ante la pregunta de la Procuradora en torno a si alguien más conocía el hecho de que ella había tomado el arma de su padre.[12] Ante su silencio, la

---

[11] Adviértase que la agente Souchet sabía dónde encontrar a Will toda vez que ya lo había entrevistado el día anterior.

[12] Fue en este momento en que, por primera vez, la Procuradora sospechó que Lillian estaba mintiendo; ello en vista de que los mensajes escritos en la casa de la occisa leían "Lillian te voy a matar con lo que le robaste a tu papá", lo cual era indicativo de que alguien más debía saber sobre el arma de fuego.

<u>Procuradora Aymat, procedió a hacerle las advertencias de
ley a Lillian, en presencia de su padre y de su tía</u>. Acto
seguido ésta preguntó a Lillian y a su padre si habían
entendido los derechos que cobijaban a la menor a lo que
ambos contestaron en la afirmativa.[13] La agente Souchet
buscó un formulario donde se enumeraban las referidas
advertencias y procedió a hacerle a Lillian las
advertencias. De acuerdo a las determinaciones de hechos
que realizara el Tribunal de Primera Instancia, las
referidas advertencias le fueron explicadas, <u>por segunda
ocasión</u>, a Lillian y a sus familiares, esta vez por la
agente Souchet, el Fiscal Esparra y la Procuradora Aymat.[14]

---

[13] Transcripción de la Vista de Supresión de Evidencia, a
la pág. 28; Petición de Certiorari, Apéndice XIV, a la
pág. 458.

[14] Sobre este aspecto el fiscal Esparra testificó lo
siguiente:

> La procuradora Aymat [hizo] las advertencias de
> rigor: Tiene derecho a permanecer callado,
> cualquier cosa que usted diga puede ser utilizado
> en su contra, tiene derecho a tener
> representación legal, tener un abogado presente
> en todas las etapas de los procedimientos,
> inclusive allí, inclusive en los momentos de la
> investigación, si ... quería[n] ... buscar un
> abogado lo podían hacer o si no el Estado tenía
> ... si ellos lo pedían tenían [sic] que buscar un
> abogado, en ese momento, a ellos. Se le explicó
> con detalles del derecho a permanecer callado, no
> decir absolutamente nada de lo que se le
> pregunte. Se le explicó también el derecho a que
> ... si quería en algún momento parar y no
> declarar absolutamente nada, que no tenía que
> hacerlo, no tenía que hacerlo. Esto, realmente,
> me acuerdo lo que se le explicó en detalle allí a
> ellos. Transcripción de la Vista de Supresión de
> Evidencia, a la pág. 11; Petición de Certiorari,
> Apéndice XIV, a la pág. 298.

Luego de esto, tanto Lillian como su padre, firmaron el referido documento.[15]

Habiendo sido debidamente advertida de sus derechos, Lillian procedió a dar una segunda versión, no sin antes solicitar que su padre abandonara la oficina, quedándose entonces en compañía de su tía Felipa. Esta vez Lillian señaló que en junio del año 2000 ella había sustraído una tarjeta de la cartera de su padre y había retirado la cantidad de seiscientos dólares ($600.00), con los cuales pagó a Ezer Muñiz para que éste matara a sus progenitores, entiéndase su padre y su madre. Explicó que en cierta ocasión había recriminado a Ezer por no haber realizado su cometido y que la noche de los hechos había dejado la puerta de su casa abierta y había entregado a Ezer una toalla. Entre la primera y la segunda versión transcurrió aproximadamente una (1) hora.

Ante esta segunda versión, el Fiscal Esparra se comunicó con el Fiscal de Distrito de Aguadilla, Luis A. Pérez Cabán, y acordaron ofrecer inmunidad parcial a la

---

Por su parte la agente Souchet testificó: "[L]as advertencias se las había hecho la Procuradora Aymat. En ese momento yo salgo breve y buscó el documento, por escrito, y se las leo. La Procuradora Aymat se las explicó también, porque se las estoy haciendo por escrito." Transcripción de la Vista de Supresión de Evidencia, a la pág. 43; Petición de Certiorari, Apéndice XIV, a la pág. 472.

[15] A pesar de que el formulario no fue admitido en evidencia por no haber sido previamente entregado a la defensa, la prueba testifical demostró no sólo la existencia del documento sino, además, el hecho de que tanto Lillian como su padre firmaron el mismo.

acusada a cambio de su testimonio en contra de Ezer; esto es, se reclasificaría el delito a uno de asesinato en segundo grado.[16] En vista de lo anterior, el Fiscal Esparra comenzó a tomarle a Lillian una declaración jurada, aproximadamente a las diez de la noche (10:00 p.m.). Previo a ello procedió a explicarle por tercera ocasión, y en presencia de su padre y de su tía, el derecho que tenía a no incriminarse con su propio testimonio y a estar asistida de un abogado.[17] En varias ocasiones le preguntó a la joven si entendía lo que se le estaba explicando, a lo que ésta contestaba en la afirmativa.[18] Le preguntó si sabía lo que era perjurio, a lo que ésta contestó que no. En vista de ello, el fiscal buscó el Código penal y

---

[16] Al respecto el fiscal Esparra testificó: "Tan pronto ... terminó esa versión de Lillian, yo recuerdo que lo paramos todo, se paró todo, había que analizar, realmente había que corroborar algo con relación a lo que estaba diciendo ella para poder proceder ... Yo recuerdo que llamé al fiscal Pérez Cabán para ... consultar con él cómo se debía proceder en este asunto y consulté con él la posibilidad de darle una inmunidad a Lillian a cambio de su testimonio contra Ezer Muñiz Benítez." Transcripción de la Vista de Supresión de Evidencia, a la pág. 13; Petición de Certiorari, Apéndice XIII, a la pág. 300.

[17] El Fiscal Esparra testificó que luego de hacerle todas las advertencias fue explicándoselas una por una de manera que tanto Lillian como su padre y su tía pudieran entenderlas. Para ilustrar dichas explicaciones expresó que el "derecho a permanecer callada" se lo explicó como que no tenía que decir nada si no quería pero que si decidía declarar, cualquier cosa que dijera él podría utilizarlo en su contra. Las referidas advertencias fueron consignadas en el documento. Transcripción de la Vista de Supresión de Evidencia, a la pág. 21; Petición de Certiorari, Apéndice XIII, a la pág. 308.

[18] Transcripción de la Vista de Supresión de Evidencia, a la pág. 22; Petición de Certiorari, Apéndice XIII, a la pág. 309.

procedió a leerle la definición allí contenida. Acto seguido, le explicó, en sus propias palabras, lo que implicaba el referido delito.[19] Además, le preguntó sobre cómo se sentía y si alguien la había amenazado, coaccionado o intimidado a lo cual la joven contestó en la negativa.

Mientras esto sucedía, la agente Souchet se dirigió a la casa de Ezer y lo condujo al cuartel. Una vez allí, luego de haberle hecho las advertencias de ley, ésta le explicó al joven que Lillian lo había acusado de dar muerte a su madre.[20] Ezer, aunque confirmó que efectivamente la acusada le había entregado una cantidad de dinero para matar a sus padres, negó haber tenido participación alguna en el asesinato. Adujo que el día de los hechos él se encontraba junto a sus padres en el Centro Comercial "Aguadilla Mall".

Inmediatamente la agente Souchet abandonó el cuartel para corroborar la veracidad de la información brindada por Ezer. Con tal fin, entrevistó al padre de éste, a su vecina y a una amiga de su mamá. Además, tuvo la oportunidad de observar un recibo de compra del referido

---

[19] Al respecto le explicó que perjurio significaba que ella no podía decir algo que no fuera cierto en la declaración jurada y que no podía cambiar versiones estando bajo juramento. Transcripción de la Vista de Supresión de Evidencia, a la pág. 23; Petición de Certiorari, Apéndice XIII, a la pág. 310.

[20] Transcripción de la Vista de Supresión de Evidencia, a la pág. 31; Petición de Certiorari, Apéndice XIV, a la pág. 460.

centro comercial, con fecha de 19 de noviembre de 2000, que tenía en su poder la madre del menor.

Habiendo confirmado la coartada de Ezer, la agente Souchet se dirigió nuevamente a la Oficina de la Procuradora e interrumpió al Fiscal Esparra, quien en ese momento se encontraba tomándole la declaración jurada a Lillian, y le informó que entendía que la peticionaria no estaba diciendo la verdad. Es en este momento en que el fiscal decide retirar la oferta de inmunidad que había hecho a Lillian. Ante esta situación, y en presencia de todos los presentes, Lillian espontáneamente exclamó que ella había "matado a su mamá". Al preguntársele dónde estaba el arma de fuego, ésta indicó que Kiki, refiriéndose a Christian Barreto, la había ayudado a desaparecer el arma y el lápiz labial con el que escribió los mensajes. La agente salió de la oficina en busca del referido joven.

Así las cosas, la agente Souchet se personó en la residencia de Christian Barreto en la madrugada del 23 de noviembre, aproximadamente a la 1:00 a.m. Allí, luego de hacerle las advertencias de rigor, la agente entrevistó a Christian quien señaló que el día de los hechos --entre las 7:30 y 8:00 de la noche-- Lillian lo había llamado para expresarle que había matado a su mamá. Éste la buscó y arrojaron el arma y el lápiz labial en un caño cercano. Durante esa madrugada, Christian y su padre acompañaron a

la agente a la oficina de la Procuradora de Menores y allí la agente le relató al fiscal lo declarado por el menor.

Luego de haber trabajado toda la noche, el Fiscal, la Procuradora y la taquígrafa de récord se retiraron, a eso de las cuatro de la madrugada, acordando reunirse nuevamente a las cuatro de la tarde.[21] Por otro lado, ya en horas de la mañana de ese 23 de noviembre, la agente Souchet localizó el arma de fuego y el lápiz labial en el lugar indicado por Christian.[22]

Esa tarde se reunieron en la Oficina de la Procuradora de Menores el Fiscal Esparra, la agente Souchet --quien acudió acompañada de la acusada--, la Procuradora Aymat, el señor Medina y la tía Felipa. Esta última había llevado ropa limpia para su sobrina por lo que pidió permiso para que pudiera cambiarse de ropa, lo cual le fue permitido. Ambas fueron a un servicio sanitario y allí conversaron a solas. Lillian le preguntó: ¿Papá me va a fiar?, a lo que su tía contestó que creía que éste no tenía dinero. A continuación, Lillian le expresó que había acusado a Will y a Ezer pero que había sido "pendeja" porque no había acusado a Christian. Señaló que ella cumpliría cien (100) años de cárcel, pero que si culpaba a Christian sólo cumpliría cincuenta (50). La tía Felipa le contestó que no debía acusar a un inocente, a lo

---

[21] Siendo la principal sospechosa de la muerte de su madre, Lillian permaneció bajo la custodia de la agente Souchet.

[22] El señor Medina corroboró que, efectivamente, se trataba del arma hurtada de su vehículo.

que ésta expresó que conocía de un inocente que había cumplido doce (12) años en la cárcel.[23] <u>Finalmente, y estando todavía a solas, la tía Felipa cuestionó a la acusada sobre si su madre había sentido dolor, a lo que ésta contestó que había muerto en el acto sin sufrir ni sentir dolor alguno</u>. Agradeció a su tía por toda la ayuda que le había brindado durante esos días y le pidió perdón. Luego de esto regresaron y se reunieron con la Procuradora Aymat y el Fiscal Esparra.

Más adelante, Lillian informó que deseaba ver a Christian, lo cual también le fue concedido. Ésta fue conducida hasta el lugar donde se encontraba el joven y frente a todos los presentes le pidió que aceptara su participación en los hechos. Acto seguido el abogado de Christian, quien también se encontraba en el lugar, le aconsejó que no hablara, retirándolo inmediatamente. Posteriormente, se le tomó una declaración jurada a Christian y se acordó que éste sería encausado por el delito de encubrimiento a cambio de su testimonio.

Durante el transcurso del día 23 de noviembre, se completaron los trámites relacionados con la investigación y se tomaron las correspondientes declaraciones juradas a Ezer y a Christian. En la mañana siguiente el caso fue sometido, determinándose causa probable contra Lillian por

---

[23] Transcripción de la Vista de Supresión de Evidencia, a la pág. 6; Petición de Certiorari, Apéndice X, a la pág. 124.

los delitos de Asesinato en Primer Grado e infracciones a los Artículos 6 y 8 de la Ley de Armas.

El 2 de abril de 2001, la representación legal de la peticionaria presentó una moción de supresión de evidencia en la cual se solicitó del tribunal que ordenara la supresión de toda expresión contra interés penal hecha por la acusada. Además, se solicitó que se ordenara la supresión de los testimonios de Ezer Muñiz Benítez, Christian Barreto Matos, los agentes Magali Souchet y Edgar López, así como el de cualquier otro policía y/o testigo cuyo testimonio se derivara de las admisiones hechas por la peticionaria. Finalmente, se solicitó la supresión de cualquier objeto (se mencionó específicamente el arma de fuego) o documento derivado de la alegada intervención ilegal. El Ministerio Público se opuso a lo solicitado y el tribunal de instancia celebró una vista los días 5, 7 y 8 de junio de 2001. En ésta testificaron por parte de la defensa el padre de la acusada --el señor Medina Sepúlveda--, el licenciado José González --abogado de Christian-- y la doctora Carol Merced Romey, sicóloga clínica.[24] Por parte del Ministerio Público testificaron la

---

[24] La doctora Carol Merced Romey visitó a Lillian en la Institución de Menores de Ponce el 26 de diciembre de 2000 a petición de la Sociedad para Asistencia Legal, solicitud que fuera hecha, específicamente, por el representante legal de la acusada, el licenciado Edwin Barreto Barreto. El propósito de la visita, según el propio testimonio de la Doctora, fue realizar una evaluación sicológica de la joven.

señora Felipa Medina Sepúlveda --tía de la peticionaria--, la agente Magali Souchet y el Fiscal Joseph Esparra.

Tras solicitar de las partes la presentación de memorando de Derecho, el tribunal de instancia emitió una resolución denegando la supresión de la evidencia solicitada. A tales efectos, entendió que la renuncia de Lillian había sido una voluntaria, inteligente y consciente de los derechos que la asistían. Coligió que el Ministerio Público cumplió con el requisito de hacerle las advertencias de ley, tanto a ella como a su padre y a su tía, y que la peticionaria había entendido todos los derechos que renunció durante el proceso que culminó en su confesión. Refiriéndose al testimonio de la doctora Romey señaló que el mismo no le merecía credibilidad. Adujo al respecto que su evaluación no incluyó un examen de expedientes o tratamientos médicos, entrevistas a familiares y que sólo se había tomado en consideración la entrevista realizada a la acusada a poco más de un mes del día de los hechos. Insatisfecha, la peticionaria Medina Hernández acudió en revisión de dicha determinación ante el Tribunal de Circuito de Apelaciones, el cual confirmó la resolución emitida.

Inconforme con la actuación del Tribunal de Circuito de Apelaciones, la peticionaria acudió en revisión --vía certiorari-- ante este Tribunal. Alega que procede revocar la sentencia emitida por el foro apelativo intermedio, debido a que dicho foro incidió:

...al confirmar la resolución del tribunal de primera instancia que decretó no ha lugar la moción de supresión de evidencia, resolviendo erróneamente que las admisiones y/o confesiones obtenidas de la menor recurrente eran admisibles en evidencia por mediar una renuncia libre, voluntaria, consciente e inteligente de su derecho constitucional a la no autoincriminación.

Expedimos el recurso. Contando con las comparecencias de las partes y estando en condición de resolver el mismo, procedemos a así hacerlo.

## II

Tanto la Constitución del Estado Libre Asociado de Puerto Rico como la de los Estados Unidos garantizan el derecho de todo ciudadano contra la autoincriminación. 1 L.P.R.A. sec. 11; Emda. V, Const. E.U., L.P.R.A., Tomo 1. Nuestra Constitución va más allá al disponer que el silencio del acusado no podrá tenerse en cuenta ni comentarse en su contra. *Id.* Cónsono con lo anterior en Pueblo en interés menor J.A.B.C., 123 D.P.R. 551, 561-62 (1989), expresamos:

No debe haber la menor duda de que el derecho que tiene todo ciudadano que habita en nuestro país, ante una imputación de delito por parte del Estado a permanecer callado, a no incriminarse y que su silencio no pueda ser tomado en su contra --garantizado el mismo por el Art. II, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1-- es uno de los derechos más trascendentales y fundamentales del derecho penal y procedimiento criminal que se practica en una democracia como la nuestra.

Es doctrina firmemente establecida que esta garantía aplica en toda su extensión a aquellos casos en que la persona a ser interrogada resulte ser un menor. Pueblo v. Figueroa González, 95 D.P.R. 98, 102 (1967); R.A.M. v. Tribunal Superior, 102 D.P.R. 270, 273 (1974); Pueblo en interés menor J.A.B.C., ante, a la pág. 564; Pueblo en interés del menor R.H.M., 126 D.P.R. 404, 424-25 (1990); Pueblo en interés del menor F.B.M., 112 D.P.R. 250, 252 (1982); Pueblo en interes del menor G.R.S., res. el 6 de julio de 1999, 99 T.S.P.R. 115; In re Gault, 387 U.S. 1, 55 (1967). A esos efectos hemos expresado que "a un menor le protege en todo momento la garantía constitucional contra la autoincriminación como parte del trato justo y debido proceso de ley a que tiene derecho." R.A.M. v. Tribunal Superior, ante, a la pág. 273.

Ahora bien, tal y como sucede en el caso de los adultos, este derecho no es absoluto. El mismo puede ser renunciado, siempre que la renuncia sea voluntaria, consciente e inteligente. Pueblo en interés del menor J.A.B.C., ante. Al respecto hemos dispuesto, citando con aprobación a Moran v. Burbine, 475 U.S. 412 (1986), que al evaluar la voluntariedad de esta renuncia deberán analizarse dos vertientes, a saber: primero, el abandono del derecho debe haber sido voluntario en el sentido de que sea producto de una elección libre y deliberada y segundo, la renuncia debe hacerse con pleno conocimiento no sólo del derecho abandonado sino de las consecuencias

de esa decisión. Pueblo v. López Rodríguez, 118 D.P.R. 515, 539 (1987). Una renuncia será voluntaria si es "realizada sin que haya mediado intimidación, coacción o violencia por parte de los funcionarios del Estado en el procedimiento que culmina en la toma de la confesión." Pueblo en interés menor J.A.B.C., ante, a la pág. 561 (1989); Pueblo v. Ruiz Bosch, 127 D.P.R. 762, 775-76 (1991).

En cuanto al requisito de que sea hecha de modo "consciente e inteligente" hemos precisado que se trata de que "el sospechoso o imputado de delito sea informado, en forma apropiada, del privilegio constitucional contra la autoincriminación; incluyendo la advertencia crucial de que cualquier manifestación que haga al respecto podrá ser usada en su contra en un proceso criminal." Pueblo en interés menor J.A.B.C., ante, a las págs. 561-62 (1989); Pueblo v. Ruiz Bosch, ante, a las págs. 775-76 (1991). Esto último requiere que "el Estado le informe, de manera eficaz, al sospechoso o imputado de delito las siguientes advertencias: que tiene el derecho a permanecer callado; que cualquier manifestación que haga podrá ser utilizada como evidencia en su contra; que tiene el derecho a consultar con un abogado de su selección antes de decidir si declara o no y contar con la asistencia de éste durante el interrogatorio, y que de no tener dinero para pagar un abogado, el Estado viene en la obligación de proveérselo." Pueblo en interés menor J.A.B.C., ante, a la pág. 562

(1989).   Véase,   además:   <u>Rivera   Escuté</u>   v.   <u>Jefe Penitenciaría</u>, 92 D.P.R. 765 (1965); <u>Pueblo</u> v. <u>De Jesús Cabrera</u>, 94 D.P.R. 450 (1967); <u>Pueblo</u> v. <u>Guadalupe</u>, 94 D.P.R. 190, 197 (1967); <u>Pueblo</u> v. <u>Chaar Cacho</u>, 109 D.P.R. 316 (1980); <u>Miranda</u> v. <u>Arizona</u>, 384 U.S. 436 (1966).

Ahora   bien,   en   la   medida   en   que   nuestros pronunciamientos   se   han   encaminado   a   ofrecer   mayores garantías constitucionales a los menores en los procesos criminales, dichas protecciones, en específico el derecho contra la autoincriminación y el derecho a una asistencia legal, <u>cobran y abarcan un terreno de mayores inquietudes</u> <u>e  incógnitas  en  la  defensa  y  la  protección  efectiva  de</u> <u>éstos</u>. Bajo esta vertiente, debemos examinar con suma cautela si, en efecto, el menor entendió o comprendió las referidas   advertencias   antes   de   renunciar   a   estas garantías. <u>Pueblo en interés del menor F.B.M.</u>, ante, a la pág. 252, citando a <u>In re Gault</u>, ante; <u>Pueblo en interés del menor J.A.B.C.</u>, ante, a la pág. 564. Cónsono con lo anterior,  y  en  aras  de  proteger  los  derechos  de  los menores, en <u>Pueblo en interés del menor F.B.M.</u>, ante, a la pág. 253, citando con aprobación la norma sentada en <u>In Re Gault</u>, ante, sostuvimos que:

> la   cláusula   de   debido   proceso   de   ley   de   la
> enmienda   decimocuarta   exige   que   en   los
> procedimientos determinantes de delincuencia que
> puedan resultar en envío a una institución donde
> se  limite  la  libertad  de  un  menor,  <u>éste  y  sus</u>
> <u>padres</u>  deben  ser  notificados  del  derecho  del
> menor   a   ser   representado   por   un   abogado
> contratado  por  ellos  o,  de  no  tener  medios

económicos para hacerlo, a que se nombre un abogado para tal fin. (Subrayado nuestro.)

En el referido caso rechazamos la posibilidad de "que el menor, a solas, sin justificación adecuada para la ausencia de un abogado o de un adulto interesado en su suerte y conocedor de sus derechos, renuncie a su derecho a no incriminarse." A esos efectos sostuvimos, citando las palabras textuales del Tribunal Supremo de los Estados Unidos en In re Gault, ante, que si por alguna razón permisible el abogado del menor no está presente al momento de obtenerse la admisión, entonces, deberá tenerse extremo cuidado al comprobar si la misma fue voluntaria, no sólo en el sentido de que no fue el producto de la coacción o la sugestión, sino, también, en el sentido de que no fue el resultado de la ignorancia de sus derechos, el pavor o el desaliento. Pueblo en interés del menor F.B.M., ante, a la pág. 252.

En cuanto al momento en que surge la obligación de hacer las antedichas advertencias es preciso resaltar que, tal y como sucede en relación con los adultos, las mismas serán necesarias tan pronto como la investigación tome el caris de acusatoria y se pose sobre el menor sospechoso con miras a extraer de éste una confesión. De modo que, ya no se trata de meras averiguaciones de un crimen sin resolver sino de un proceso acusatorio. Rivera Escuté v. Jefe Penitenciaría, ante, a la pág. 779; Pueblo v. Chaar Cacho, ante, a la pág. 324. Dicho de otro modo, para que

un menor pueda invocar exitosamente esta protección constitucional, de manera que el Estado esté impedido de presentar la confesión o admisión prestada, deberán estar presentes cuatro requisitos básicos; estos son: (1) que al momento de obtenerse la declaración impugnada ya la investigación se haya centralizado sobre la persona del menor; esto es, que ya funja como sospechoso de la comisión de una falta o delito; (2) que al momento de prestar la declaración en cuestión ya se encuentre "bajo custodia del Estado"; (3) que la declaración haya sido "producto de un interrogatorio" realizado con el fin de obtener manifestaciones incriminatorias; (4) que no se le haya advertido --en presencia de un adulto interesado en el bienestar del menor o de un abogado-- sobre los derechos constitucionales que nuestro ordenamiento le garantiza. Pueblo v. López Guzmán, ante, a la pág. 883; Pueblo en interés del menor F.B.M., ante, a la pág. 253.

Respecto al criterio que deberán utilizar los tribunales, al analizar la validez de la renuncia al privilegio contra la autoincriminación, hemos establecido que, al igual que en el caso de los adultos, ésta deberá estar basada en el análisis de la "totalidad de las circunstancias". Pueblo en interés menor J.A.B.C., ante, a la pág. 562. A esos efectos, el Tribunal Supremo de los Estados Unidos ha señalado que:

> This totality-of-the-circunstances approach is adecuate to determine whether there has been a waiver even where interrogation of juveniles is

involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits -indeed, it mandates- inquiry into all the circumstances surrounding the interrogation. This includes evaluation of juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights. Fare v. Michael C., 442 U.S. 707, 725 (1979).

Acorde con lo anterior, hemos precisado que entre los muchos _factores_ que deberán ser sopesados por los tribunales bajo el mencionado criterio, se encuentran: (1) la persona del menor y sus circunstancias personales y particulares; esto es, edad, experiencia, instrucción académica, etc.; (2) el período de tiempo que estuvo bajo custodia policíaca antes de prestar la confesión; (3) si estuvo o no acompañado por un familiar; (4) si efectivamente estuvo o no asistido por un abogado al confesar, etc.; Pueblo en el interés del menor J.A.B.C., ante, a la pág. 563, n.7.[25] De igual forma hemos advertido

---

[25] En State v. Benoit, 126 NH 4, 490 A2d 295, 302 (1985), el tribunal de New Hampshire esboza una lista extensa de factores que han de evaluarse bajo el criterio de la totalidad de las circunstancias, que incluye:

(1) the chronological age of the juvenile; (2) the apparent mental age of the juvenile; (3) the educational level of the juvenile; (4) the juvenile's physical condition; (5) the juvenile's previous dealing with the police or court appearances; (6) the extent of the explanation of rights; (7) the language of the warnings given; (8) the methods of interrogation; (9) the length

sobre la insuficiencia de una lectura mecánica de los derechos reconocidos en Miranda v. Arizona, 384 U.S. 436 (1966). Pueblo en interés del menor F.B.M., ante, a la pág. 252. A tales efectos hemos enfatizado que, cuando se trata de menores, hay que intentar asegurarse de la voluntariedad de su confesión mediante la indagación de los factores antes mencionados y el examen de la "totalidad de las circunstancias" que tuvieron lugar en el momento en que se produjo la confesión. *Id.*

Ahora bien, es al Estado a quien le corresponde probar que la confesión efectuada obedeció a una renuncia válida de las protecciones constitucionales para que la misma sea admisible en evidencia. Pueblo en interés del menor F.B.M., ante; Pueblo v. Pellot Pérez, 121 D.P.R. 791, 802 (1988); Pueblo v. García Ciuro, 134 D.P.R. 13, 17 (1993). Es el Estado quien tendrá que demostrar que la renuncia fue voluntaria, consciente e inteligente. Para ello es preciso que se desfile prueba detallada sobre las advertencias específicas que se le hicieron al sospechoso y sobre las condiciones imperantes en el momento en que éste hizo la admisión o confesión. Pueblo v. Ruiz Bosch, ante, a la pág. 776; Pueblo v. García Ciuro, *Id*. Esta es

---

of the interrogation; (10) the length of time the juvenile was in custody; (11) whether the juvenile was held incommunicado; (12) whether the juvenile was afforded the opportunity to consult with an adult; (13) the juvenile's understanding of the offense charged; (14) whether the juvenile was warned of possible transfer to adult court; and (15) whether the juvenile later repudiated the statement.

la única manera en que un tribunal puede determinar, a base del criterio de la "totalidad de las circunstancias", si dicha renuncia fue voluntaria, consciente e inteligente. Pueblo v. Ruiz Bosch, ante, a la pág. 776; Pueblo v. García Ciuro, ante, a la pág. 18.

### III

Con estos pronunciamientos en mente, pasamos a analizar la validez de la confesión prestada por la menor peticionaria, Lillian Enid Medina Hernández. Para ello es preciso que comencemos por dilucidar si el Ministerio Público cumplió con su deber de demostrar que se hicieron las advertencias legales y que la menor renunció a su derecho a no autoincriminarse de forma voluntaria mediante un abandono libre, consciente e inteligente del mismo.

### A

La prueba presentada a nivel de instancia demuestra que las advertencias de ley, en cuanto a su derecho a no autoincriminarse y a tener asistencia de abogado, fueron hechas tan pronto como surgió la sospecha de que, en efecto, la peticionaria podía estar implicada en el asesinato de su madre. Esto fue cuando la menor, luego de haber aceptado que las imputaciones contra Will no eran ciertas, se reafirmó en que había robado el arma de fuego del vehículo de su padre y guardó silencio al preguntársele si había dicho a alguien que tenía el arma

en su poder. Fue en este momento en que la Procuradora Aymat, quien sabía sobre los mensajes dejados en la residencia, sospechó por primera vez de Lillian. Como señaláramos, en este momento la Procuradora procedió a explicarle a la menor, en presencia de su padre y de su tía, las advertencias de ley exigidas por nuestra jurisprudencia en esta clase de situaciones. Al preguntarle si entendía las mismas ésta contestó en la afirmativa. Las referidas advertencias fueron explicadas nuevamente por la agente Souchet, quien le dio a firmar un documento que contenía las mismas a Lillian y a su padre.

En su escrito ante nos la representación legal de la peticionaria alega que para la madrugada del 20 de noviembre ya Lillian figuraba como sospechosa de la muerte de su madre, razón por la cual se le debió apercibir de sus derechos desde ese instante. Los fundamentos que se aducen en apoyo a esta contención no nos mueven a intervenir con la apreciación de la prueba que, en relación con este hecho, realizara el foro de instancia.[26] Adviértase que el interrogatorio realizado a la menor peticionaria, el cual dio lugar a la confesión aquí en controversia, se llevó a cabo, precisamente, a instancias de ésta. Estamos convencidos, tal y como lo estuvo el tribunal de instancia, que previo a ello Lillian nunca fue considerada como sospechosa y sí como una posible víctima, dadas las amenazas encontradas en su residencia la noche de los hechos.

Lo anterior queda evidenciado si consideramos que la única entrevista realizada, previo al referido interrogatorio, se llevó a cabo el 20 de noviembre de 2000; entrevista que también fue realizada a su hermana y a su padre y que, de acuerdo a las determinaciones de hechos realizadas por el foro primario, duraron apenas varios minutos. No fue hasta el 22 de noviembre --segundo día de la investigación-- que los agentes volvieron a

---

[26] A tales efectos aduce la defensa que sólo Lillian y su padre fueron llevados al cuartel la noche de los hechos, que la agente Souchet ocupó una libreta perteneciente a Lillian y que el señor Medina indicó haber creído que tanto él como Lillian fungían como sospechosos.

hablar con Lillian, <u>conversación que, repetimos, se inició a instancias de la propia menor</u>.

Siendo así, es evidente que en este momento <u>no</u> estaban presentes ninguna de las circunstancias que activan las garantías constitucionales y obligan al Estado a impartir las advertencias de ley; esto es, Lillian <u>no</u> se encontraba bajo la custodia del Estado, <u>no</u> era una sospechosa sobre la cual se hubiese centrado investigación alguna y <u>tampoco</u> se le estaba interrogando con miras a obtener de ésta alguna manifestación incriminatoria.


B

En cuanto a la voluntariedad de la confesión, el señor Medina, padre de la peticionaria, testificó que el trato recibido por su hija fue uno justo y cordial sin que hubieran mediado humillaciones o maltrato alguno.[27] No podemos avalar el argumento de la menor peticionaria a los efectos de que el llevar a Will al cuartel mientras ésta aún se encontraba en el lugar tuvo el efecto de crear un ambiente intimidante. <u>Como señaláramos, en este momento la menor figuraba como testigo y no como sospechosa</u>. No hay un solo ápice de prueba que ni tan siquiera sugiera que a ésta se le impidió abandonar el lugar mientras se llevaba a cabo el arresto de Will. Por el contrario, del testimonio de la agente Souchet surge que en este momento

---

[27] Transcripción de la Vista de Supresión de Evidencia, a la pág. 84; Petición de Certiorari, Apéndice IX, a la pág. 102.

la menor podía retirarse y que <u>no</u> estaba detenida <u>ni</u> se le impidió abandonar el lugar.[28] Siendo así es razonable concluir que si Lillian aún se encontraba en el cuartel a la llegada de Will ello correspondió a una mera coincidencia y no al intento por parte del Estado de coaccionar o intimidar a la menor. Tampoco puede entenderse que los esfuerzos realizados por los agentes de la policía para corroborar la información que obtenían constituyeran coacción o intimidación en contra de Lillian.

Lo mismo aplica en cuanto a la alegación de que no se le permitió retirarse del cuartel durante el tiempo que duró la investigación. <u>De modo alguno puede entenderse que Lillian tenía su libertad de acción restringida durante las primeras etapas del proceso investigativo</u>. <u>Siendo una simple testigo pudo haberse retirado en cualquier momento</u>. Claro que, como es natural, luego de su confesión ya esto no era posible y desde este momento permaneció bajo la custodia de los agentes del Estado.

<u>Tampoco es correcta la contención de la peticionaria a los efectos de que fue interrogada durante un periodo de tiempo de tres días</u>. Al remitirnos a las determinaciones de hechos realizadas por el tribunal de primera instancia encontramos que dicho foro entendió <u>que la duración del interrogatorio en cuestión fue de aproximadamente ocho (8)</u>

---

[28] Transcripción de la Vista de Supresión de Evidencia, a la pág. 84; Petición de Certiorari, Apéndice XIV, a la pág. 513.

horas. Sin embargo, y ante la alegación de la peticionaria de que esta determinación es incorrecta, hemos examinado minuciosamente la transcripción de evidencia en busca de indicios que nos permitan establecer la verdadera duración del referido interrogatorio. Al así hacerlo encontramos que, tal y como reseñáramos previamente, éste comenzó entre las 5:45 y 6:00 de la tarde y terminó antes de la 1:00 de la madrugada, hora en que la agente Souchet acudió a la casa de Christian para corroborar la confesión de la menor. Es decir, el interrogatorio duró menos de siete (7) horas, de las cuales en la primera de ellas Lillian figuraba como testigo y no como sospechosa.

Por otro lado, es menester resaltar que durante las restantes seis (6) horas a Lillian se le estuvo tomando una declaración jurada en torno a su segunda versión, para lo cual fue necesario, no sólo contactar nuevamente a la taquígrafa de récord, y por consiguiente esperar a que ésta llegara, sino, además, contactar al Fiscal Pérez Cabán para que abriera las oficinas de la Fiscalía; debe recordarse que la entrevista a Lillian se estaba realizando en la Oficina de la Procuradora y no en el área de la Fiscalía.[29]

---

[29] Sobre este particular el Fiscal Esparra testificó que:

> Cuando Lillian ... había relacionado a Will, me lo habían dicho ya por teléfono, yo le había dicho a la Taquígrafa que se quedara, que se quedara en la Fiscalía, porque aparentemente íbamos a tener que tomar [una] declaración jurada. Sin embargo, cuando ... me di cuenta de

Durante este periodo de tiempo, además, se estuvo tramitando un acuerdo de inmunidad para la menor. A tenor con lo anterior, de modo alguno, podría entenderse que estas siete horas fueron de un "interrogatorio constante e ininterrumpido". Por el contrario, entendemos que se trató de un tiempo razonable, considerando las circunstancias particulares en que se llevó a cabo el mismo.

C

Nos resta resolver si Lillian prestó la confesión aquí en controversia de forma "consciente e inteligente". Ello requiere que evaluemos si, en efecto, ésta renunció a

---

que lo de Will no era cierto le dije a la Taquígrafa que se fuera, ..., que no era necesario. Entonces, cuando vuelve y relata lo de Ezer yo recuerdo que llamé a la Taquígrafa de nuevo, pero tenía un problema porque yo había mandado a cerrar el segundo piso de la Fiscalía y en aquel momento yo no tenía llaves de la Fiscalía, y llamo al Fiscal Pérez Cabán para que baje, por favor que me traiga las llaves de la Fiscalía y llamó a la ... Taquígrafa para que regrese a la Fiscalía. El Fiscal Pérez se persona allí a la Fiscalía y anotamos de qué era lo que estaba pasando nuevamente y entonces abrimos la Fiscalía. La ... Taquígrafa ya había llegado ... y habíamos intentado coger parte de la declaración jurada en la computadora de la Procuraduría de Menores, pero no fue posible porque ella no entendía bien cómo era que bregaba la computadora en la Procuraduría de Menores. Subimos al segundo piso, se buscaron los documentos, se buscó un modelo para hacer ... el convenio de inmunidad que se le iba a dar a Lillian ... ." Transcripción de la Vista de Supresión de Evidencia, a la pág. 15; Petición de Certiorari, Apéndice XIII, a las págs. 301-02.

su derecho a no autoincriminarse y a estar asistida por un abogado, luego de haber sido informada --de manera eficaz-- del referido derecho y de las consecuencias que conllevaba renunciar al mismo. Además, es necesario que analicemos si la menor comprendió las referidas advertencias. Veamos.

De entrada es preciso que enfaticemos el hecho de que en el presente caso la peticionaria fue informada de su derecho a no autoincriminarse y a estar acompañada por un abogado no en una <u>sino en tres ocasiones distintas</u>. Además, las referidas advertencias fueron hechas en un lenguaje sencillo y coloquial sin que pueda entenderse que el Estado se limitó a hacerlas en forma mecánica o utilizando un lenguaje técnico o rebuscado.

La primera ocasión en que se le explicaron a Lillian las referidas advertencias ocurrió a menos de una hora de comenzada la entrevista del 22 de noviembre, esto es, previo a que Lillian comenzara a dar su segunda versión de los hechos. Sobre este particular el Fiscal Esparra testificó lo siguiente:

> La procuradora Aymat [hizo] las advertencias de rigor: Tiene derecho a permanecer callado, cualquier cosa que usted diga puede ser utilizado en su contra, tiene derecho a tener representación legal, tener un abogado presente en todas las etapas de los procedimientos, inclusive allí, inclusive en los momentos de la investigación, si ... quería buscar un abogado lo podían hacer o si no el Estado tenía ... si ellos lo pedían tenían que buscar un abogado, en ese momento, a ellos. Se le explicó con detalles del derecho a permanecer callado, no decir absolutamente nada de lo que se le pregunte. Se

le explicó también el derecho a que ... a que si quería en algún momento parar y no declarar absolutamente nada, que no tenía que hacerlo, no tenía que hacerlo. Esto, realmente, me acuerdo lo que se le explicó en detalle allí a ellos. Transcripción de la Vista de Supresión de Evidencia, a la pág. 11; Petición de Certiorari, Apéndice XIV, a la pág. 298.

Luego de esto, la agente Souchet procedió a explicarle por segunda ocasión las referidas advertencias a la joven --y a su padre-- esta vez leyendo de un documento que contenía las mismas. En ambas ocasiones tanto Lillian como su padre afirmaron haber entendido cuáles eran los derechos que en esos momentos cobijaban a la menor.

Ahora bien, y como señaláramos anteriormente, Lillian --habiendo sido previamente informada de que tenía un derecho a permanecer en silencio y a estar asistida por un abogado-- procedió a dar una segunda versión de los hechos. En esta ocasión se implicó a sí misma como autora intelectual del delito e identificó a otro joven como la persona a quien contrató para dar muerte a sus progenitores. La evidencia más patente de que los funcionarios que realizaban la investigación estaban completamente convencidos de la veracidad de las palabras de Lillian es que en este momento se negoció un acuerdo mediante el cual se le ofreció inmunidad a la menor a cambio de su testimonio contra el joven implicado. A esos efectos, aun cuando no se había confirmado la veracidad de esta segunda versión, se procedió a tomarle una

declaración jurada a la peticionaria. Fue aquí en que por tercera ocasión se le explicó a la menor, en presencia de su padre y de su tía, que si no quería no tenía que decir nada pero que si decidía decir algo entonces el Fiscal Esparra podría utilizarlo en su contra.[30] Además, se le explicó que si no quería contestar algo de lo que se le preguntaba no lo tenía que hacer. También se les informó --tanto a Lillian como a su padre y a su tía-- que tenían el derecho a estar acompañados por un abogado y que si no tenían los medios para ello el propio Fiscal Esparra tendría que conseguirlo.[31] Nuevamente todos contestaron en la afirmativa al preguntárseles si entendían lo que se les estaba explicando.[32]

Acto seguido el Fiscal Esparra procedió a hacer varias preguntas a la menor para asegurarse de la voluntariedad de su declaración. Al respecto testificó el fiscal:

> Le pregunté "cómo se sentía en esos momentos", me dijo que "se sentía bien físicamente". Si padecía de alguna enfermedad, ella me manifestó que padecía de un soplo en el corazón. Había mencionado anteriormente "si había hecho uso de sustancias controlada[s]", me dijo que no. "Si

---

[30] El documento conteniendo la declaración inconclusa de Lillian fue presentado y admitido en evidencia en la vista de supresión. En éste aparecen consignadas nuevamente las advertencias de ley impartidas por el Fiscal Esparra.

[31] Adviértase que no se explicaron los derechos en forma mecánica sino en palabras sencillas que fácilmente podía entender una menor de quince (15) años como Lillian.

[32] Transcripción de la Vista de Supresión de Evidencia, a la pág. 24; Petición de Certiorari, Apéndice XIII, a la pág. 311.

había ingerido algún tipo de medicamento, especialmente ese día" y me contestó que no. Le pregunté "si había sido maltratada, ofendida, amenazada por un [sic] miembro de la policía que está [sic] envuelto en el caso", me contestó que no. Le pregunté "si había sido maltratada, amenazada por el Fiscal o algún otro funcionario que estuviera a cargo de la investigación", me dijo que no. Le pregunté entonces si --nuevamente-- "si la determinación de usted, de prestar la declaración jurada, es libre, voluntaria, sin haber sido [sic] ningún tipo de intimidación de algún funcionario", me dijo que no. "Si alguna agencia --como es la Policía de Puerto Rico, el Departamento de Justicia-- ha intervenido en su determinación de declarar libre y voluntariamente", me contestó que no ... Transcripción de la Vista de Supresión de Evidencia, a las págs. 23-24; Petición de Certiorari, Apéndice XIII, a las págs. 310-11.

Adviértase que en este punto ya se le han explicado sus derechos a Lillian --en presencia de su padre y de su tía-- en tres ocasiones. Esto es, en tres momentos distintos, la menor afirmó haber entendido cuáles eran sus derechos y aun así continuó con sus declaraciones. Habiendo sido precedida no por una sino por tres explicaciones de las protecciones constitucionales que en ese momento protegían a la menor, y habiendo afirmado ésta en tres ocasiones que en efecto entendía las mismas, forzoso es concluir que la renuncia que ésta hizo a su derecho a no autoincriminarse fue una completamente "consciente e inteligente". Adviértase, además, que Lillian le expresó a su tía que tendría que cumplir cien (100) años de cárcel; esto es, sin lugar a dudas conocía sobre las consecuencias de su renuncia.

Pero ¿qué de la subsiguiente confesión? Recordemos que ésta ocurrió luego de que se descubre la falsedad de la segunda versión prestada por la menor. Es cuando se le informa que la inmunidad sería retirada que ésta decide dar una tercera versión. Sencillamente, la menor no contaba con que sus versiones serían corroboradas por los agentes, razón por la cual ella misma fue tejiendo una encrucijada de la cual le fue imposible escapar.

Nótese que se trató de una manifestación espontánea que no estuvo precedida por ninguna clase de coacción, intimidación ni violencia. Ni siquiera se le estaba ya interrogando.[33] Simplemente se le informó que habían descubierto que mentía y que por tal razón su inmunidad sería retirada. Ello, por sí sólo, no puede ser considerado de modo alguno como indicio de coacción, violencia o intimidación alguna.

Ante unos hechos tan patentes no podemos avalar la contención de la representación legal de la peticionaria a los efectos de que la confesión de la menor no estuvo

---

[33] En vista de que el interrogatorio había cesado falta uno de los requisitos básicos que da lugar a la obligación de hacer las advertencias de rigor en estas circunstancias. En Pueblo v. Laguna Rodríguez, 92 D.P.R. 831, 833-34 (1962), este Tribunal estableció que la norma establecida en Rivera Escuté, 92 D.P.R. 765 (1965), sobre la obligación de hacer las advertencias de ley, no es de aplicación cuando las manifestaciones son hechas por el sospechoso de forma espontánea sin que en ese momento se le estuviera interrogando con el fin de obtener manifestaciones incriminatorias. Aún así es preciso recordar el hecho de que en este caso la joven, Lillian Enid Medina Hernández, ya había sido advertida de sus derechos en tres ocasiones.

precedida por una renuncia voluntaria, consciente e inteligente de los derechos que en ese momento la cobijaban. Indudablemente los hechos de este caso demuestran que, a pesar de su minoría de edad, Lillian es una joven inteligente y muy suspicaz que tuvo el ingenio para planificar cada una de sus versiones las cuales, según el testimonio del Fiscal Esparra, eran muy coherentes y convincentes.[34]

---

[34] La contundente evidencia presentada ante el foro primario, en cuanto al modo en que Lillian fraguó diversas versiones de los hechos, no nos permite avalar la opinión emitida por la doctora Carol Romey en el presente caso, a los efectos de que la renuncia hecha por Lillian no fue una libre y voluntaria por no tener la capacidad para ello. Adviértase que la doctora Romey apoya su conclusión en el hecho de que el día 26 de diciembre de 2000 --fecha en que ésta visitó a Lillian a la Institución de Menores en la que se encontraba-- observó que la joven presentaba un cuadro clínico de emergencia máxima, una personalidad totalmente desorganizada, un proceso sicótico activo y una ideación suicida alarmante. Al respecto señaló que si dicha condición no permitía que Lillian pudiera prestar un consentimiento válido a la evaluación que ésta le haría, menos aún pudo haber renunciado a unos derechos que no entendía. Ahora bien, estas observaciones se llevaron a cabo a más de un mes de ocurridos los hechos del presente caso. Un mes en que la menor estuvo privada de las ocho o diez bolsas de cocaína que afirmó haber estado utilizando diariamente, un mes de estar encerrada --a solas-- en una celda de una institución juvenil, apartada de los familiares que la acompañaron durante el curso investigativo del caso. Sin lugar a dudas, coincidimos con la opinión del foro primario a los efectos de que ante un cuadro fáctico como el descrito, de modo alguno, podría merecer credibilidad el testimonio emitido por la doctora Romey. Más aún cuando su evaluación dependió exclusivamente de la entrevista antes descrita, sin tener el beneficio de examinar expedientes o tratamientos médicos efectuados a la menor o entrevistas a familiares, maestros o amigos. Consistentemente hemos resuelto que los tribunales no están obligados a seguir indefectiblemente la opinión, juicio, conclusión o determinación de un perito, estando en plena libertad de adoptar su propio criterio al evaluar la prueba pericial y hasta descartar

D

La representación legal de la menor peticionaria nos invita a adoptar en el presente caso una norma mediante la cual se rechace, *a priori,* la admisibilidad de toda confesión o admisión hecha por un menor si al momento de prestar la misma éste no estaba acompañado de un abogado o de un adulto interesado en su bienestar. Lisa M. Krzewinski, *But I Didn't do it: Protecting the rights of juveniles during Interrogation*, 22 B.C. THIRD WORLD L.J. 355, 368 (2002).[35] Aduce que el criterio de la "totalidad de las

_____

la misma aun cuando resulte ser técnicamente correcta. Prieto v. Maryland Casualty Co., 98 D.P.R. 594, 623 (1970); Culebra Enterprises Corp. v. Estado Libre Asociado, 143 D.P.R. 935, 952-53 (1997); Dye Tex v. Royal Insurance, res. el 27 de marzo de 2000, 2000 T.S.P.R. 54. No encontramos indicio alguno de parcialidad, error manifiesto, pasión o prejuicio. Ciertamente, el fundamento utilizado por el foro de instancia para descartar el testimonio pericial en el presente caso nos parece no sólo adecuado sino correcto. Maldonado v. Burris, res. el 8 de mayo de 2001, 2001 T.S.P.R. 68.

[35] Bajo este criterio serían suprimibles todas aquellas confesiones obtenidas sin que el Estado haya cumplido con ciertas garantías procesales; tales como: (1) que el menor haya consultado con un adulto interesado en su bienestar o con un abogado antes de haber renunciado a su derecho contra la autoincriminación; (2) que el adulto que acompañe al menor esté genuinamente interesado en su bienestar; (3) que el adulto interesado sea a su vez informado de los derechos constitucionales que en ese momento protegen al menor. Lawrence Schlam, *Police Interrogation of Children and State Constitutions: Why Not Videotape the MTV Generation?,* 26 U. TOL. L. REV. 901, 915 (1995). Adviértase que a tenor con este criterio para invalidar la confesión de un menor es suficiente la presentación de prueba que tienda a demostrar la incompetencia del adulto interesado. Por el contrario, en el caso de la regla de la "totalidad de las circunstancias" ello constituiría sólo un factor adicional a ser sopesado junto a las demás circunstancias presentes. Andy Clark, *"Interested Adults" with conflicts of interest*

circunstancias", utilizado en el caso de los adultos, resulta inapropiado cuando el que renuncia a su derecho a no autoincriminarse es un menor.

Un análisis de nuestra jurisprudencia revela que tal proceder resulta innecesario dado que los criterios que al día de hoy ha establecido este Tribunal en torno a este asunto, refiriéndonos específicamente al caso de los menores, no se limitan a evaluar la "totalidad de las circunstancias" que rodearon la confesión, sino que además, se han sentado pautas en cuanto a la necesidad de que en todo momento el menor esté acompañado por un abogado o un adulto interesado en su bienestar. Pueblo en interés del menor F.B.M., ante, a las págs. 253-54; Pueblo en interés del menor J.A.B.C., ante, a la pág. 567, n.13. De este modo hemos requerido que los padres del joven imputado sean informados del alcance de la renuncia que a sus derechos pueda hacer el menor implicado. Pueblo en interés del menor F.B.M., ante, a las págs. 253.

Ahora bien, adviértase que no se trata de que necesariamente el menor tenga que estar acompañado por un abogado antes de prestar una confesión. Bien podría estar en compañía de un adulto, pero, de ser este el caso, ambos tendrían que ser informados de los derechos que en ese momento cobijan al menor, esto es, el derecho a asistencia legal y a no autoincriminarse. Claro que, ante la ausencia

al *Juvenile Interrogations: Applying the Close Relationship Standard of Emotional Distress*, 68 U. CHI L. REV. 903, 914 (2001).

de un abogado los tribunales deberán examinar con más cuidado y detenimiento la 'totalidad de las circunstancias' que rodearon la renuncia del citado derecho constitucional, con el propósito de resolver la interrogante de si ésta se llevó a cabo en forma 'consciente e inteligente'. Pueblo en interés del menor J.A.B.C., ante, a la pág. 567, n.13.

En cuanto a si el adulto que acompañaba al menor estaba realmente interesado en su bienestar, los tribunales deberán utilizar nuevamente el criterio de la "totalidad de las circunstancias" que rodearon la confesión prestada. A tales efectos deberá analizarse, entre otras cosas, si existía alguna rivalidad o conflicto de interés entre éste y el menor imputado de delito. Además, deberá evaluarse si el adulto interesado tenía la capacidad para comprender la situación por la cual atravesaba el menor para poder brindarle su consejo. Com. v. Philip S., 611 N.E.2d 226, 231 (Mass., 1993). La posibilidad de que una víctima del hecho delictivo pueda, a su vez, fungir como un adulto interesado también deberá ser analizada tomando en consideración las circunstancias particulares de cada caso.

A tono con lo anterior es preciso que evaluemos si en el caso de autos la menor peticionaria estuvo o no acompañada por un adulto interesado en su bienestar. Ello lo haremos analizando la "totalidad de las circunstancias"

presentes, no sólo al momento de la confesión, sino además, durante la etapa investigativa del caso.

En primer lugar, es preciso resaltar que en el presente caso Lillian estuvo acompañada no sólo por su padre sino que, <u>además</u>, por su tía Felipa. La prueba demuestra que <u>ambos</u> estuvieron presentes en las tres ocasiones en que Lillian fue informada de sus derechos y que ambos contestaron en la afirmativa al ser cuestionados en torno a si entendían las advertencias que se le estaban haciendo a la menor.[36] En cuanto a si el señor Medina --padre de la peticionaria-- puede ser considerado como un adulto interesado en el presente caso es preciso recordar que éste se personó al cuartel de Aguadilla tan pronto como terminó el sepelio de su esposa, se preocupó por buscar alimento a la menor[37] y delegó en su hermana Felipa para que cuidara de su hija durante todo el tiempo en que no pudo estar presente. Ello demuestra el interés que,

---

[36] La prueba demuestra que la mayor parte del tiempo Lillian estuvo acompañada de su papá o su tía. Si en algún momento estuvo a solas con los agentes, ello fue por un lapso de tiempo muy corto, considerando que ello ocurría mientras uno de los dos salía al automóvil en busca del otro para que lo relevara. No obstante lo anterior, la prueba revela que Lillian siempre estuvo acompañada en los momentos en que recibió las advertencias de ley.

[37] El señor Medina testificó que salió a buscar un sándwich a su hija mientras ésta era interrogada, aunque no pudo precisar la hora exacta. Transcripción de la Vista de Supresión de Evidencia, a la pág. 37; Petición de Certiorari, Apéndice IX, a la pág. 55.

como padre, éste tenía en el bienestar de su hija y en velar por sus derechos.

En cuanto al interés que la tía Felipa demostró tener por el bienestar de su sobrina, basta con resaltar el hecho de que en cierta ocasión la orientó para que no continuara declarando, señalándole que podía permanecer en silencio y pedir que le trajeran a un abogado. Además, le recalcó que "lo que estaba declarando l[a] estaba perjudicando."[38] También se ocupó de llevarle ropa limpia a la menor y de solicitar permiso para que ésta pudiera cambiarse. Resulta pertinente señalar el hecho de que Lillian le agradeció a su tía por toda la ayuda recibida y le pidió perdón por haberla hecho pasar por tal situación. Lo anterior demuestra no sólo el interés que la tía Felipa tenía en el bienestar de su sobrina, sino además, la confianza que la menor había depositado en ésta.

Definitivamente, no podemos avalar la contención de la menor peticionaria a los efectos de que ni la tía Felipa, ni el señor Medina, pueden ser considerados como "adultos interesados" por ser víctimas directas del delito investigado. Un análisis de las circunstancias envueltas demuestran que, a pesar de la dolorosa situación, éstos sí se preocuparon por la menor, asistiéndola efectivamente durante todo el proceso. Adviértase, además, que éstos no

---

[38] Transcripción de la Vista de Supresión de Evidencia, a la pág. 15; Petición de Certiorari, Apéndice X, a la pág. 133.

sabían cuán implicada estaba la menor en el asesinato hasta que finalmente ésta confesó su crimen. El que no hayan tratado de inducir a Lillian a guardar silencio o a encubrir el hecho delictivo, definitivamente, no significa que no estuvieran interesados en su bienestar. Ya hemos señalado que:

> [l]os que redactaron las constituciones de Puerto Rico y de los Estados Unidos, ciertamente tuvieron en mente prohibir que nadie fuese obligado a incriminarse mediante su propio testimonio, <u>pero no se propusieron prohibir que un delincuente confesase libre y voluntariamente su crimen haciendo así las paces con su conciencia y con la sociedad</u>. Esas dos constituciones tienen cono uno de sus objetivos proteger la libertad de la conciencia de los seres humanos, no encadenarlas al mal. Dichas constituciones no exigen que una persona que ha llegado a ser delincuente est[é] además obligada a ser mentiroso o perjuro toda su vida. Lo ético es decir la verdad aunque eso resulte amargo. La constitución no está reñida con la ética. <u>Pueblo</u> v. <u>Rodríguez Martínez</u>, 100 D.P.R. 805, 812 (1972). (Énfasis suplido.)

El requisito de que al momento de una confesión el menor esté acompañado por un adulto o un abogado, y que sea informado de sus derechos frente a éstos, obedece al interés del Estado de asegurar que la renuncia que a sus derechos haga el menor sea una voluntaria, consciente e inteligente. <u>De modo alguno puede entenderse que el propósito de tal requisito sea cohibir al menor ante su deseo de confesar voluntariamente su falta o delito</u>. Ello coincide con el enfoque ecléctico de acción e intervención adoptado por la nueva Ley de Menores al abandonar la orientación paternalista y tutelar que guiaba la antigua

Ley y acoger una visión donde se armoniza la responsabilidad de *parens patriae* del Estado con el deber de los ofensores de responder por sus actos. Exposición de Motivos de la Ley Núm. 88, Leyes de Puerto Rico, 1986, pág. 286; véase, además: <u>Pueblo de Puerto Rico en interés del menor G.R.S.,</u> res. el 6 de julio de 1999, 99 T.S.P.R. 115.

<u>En virtud de todo lo antes expuesto, forzoso es concluir que la confesión prestada por Lillian obedeció a una renuncia voluntaria, consciente e inteligente de los derechos que en ese momento la cobijaban.</u> No albergamos duda alguna en torno al hecho de que la menor peticionaria fue advertida de manera eficaz --utilizando un lenguaje sencillo y ofreciéndole ejemplos claros-- del derecho a no autoincriminarse y a estar asistida por un abogado. Del mismo modo, entendió las advertencias que se le hicieron, estuvo acompañada por familiares interesados en su bienestar y, sobre todo, voluntariamente decidió confesar aun cuando conocía las consecuencias de tal actuación.

IV

En mérito de lo anterior, procede dictar Sentencia <u>confirmatoria</u> de la emitida por el Tribunal de Circuito de Apelaciones, y devolver el caso al Tribunal de Primera Instancia, Sala Superior de Aguadilla, para procedimientos ulteriores consistentes con lo aquí resuelto.

Se dictará Sentencia de conformidad.

FRANCISCO REBOLLO LOPEZ
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

**El Pueblo de Puerto Rico**

    **Recurrido**

        **vs.**                **CC-2001-662 CERTIORARI**

**Lillian E. Medina Hernández**

    **Acusada-peticionaria**

SENTENCIA

San Juan, Puerto Rico, a 5 de febrero de 2003

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia confirmatoria de la emitida por el Tribunal de Circuito de Apelaciones; devolviéndose el caso al Tribunal de Primera Instancia, Sala Superior de Aguadilla, para procedimientos ulteriores consistentes con lo aquí resuelto.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Hernández Denton disintió sin opinión escrita.

Patricia Otón Olivieri
Secretaria del Tribunal Supremo