EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Pedro Marrero<br><br>Recurrido | Certiorari<br><br>2023 TSPR 150<br><br>213 DPR ___ |

Número del Caso:  CC-2023-0102

Fecha:  29 de diciembre de 2023

Tribunal de Apelaciones:

    Panel II

Oficina del Procurador General:

    Hon. Fernando Figueroa Santiago
    Procurador General

    Lcda. Mabel Sotomayor Hernández
    Subprocuradora General

    Lcda. Aracelis Burgos Reyes
    Procuradora General Auxiliar

    Lcdo. Orlandy Cabrera Valentín
    Procurador General Auxiliar

Abogado del Recurrido
Sociedad para Asistencia Legal:

    Lcdo. Elmer Rodríguez Berríos

Materia:  Derecho Procesal Penal – No procede la supresión de una confesión por el solo hecho de que hayan transcurrido más de 36 horas entre el arresto y el momento en que la persona detenida fue llevada ante el tribunal.

Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

     Peticionario

        v.             CC-2023-0102

Pedro Marrero

     Recurrido

Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES.

En San Juan, Puerto Rico, a 29 de diciembre de 2023.

En este caso debemos auscultar si procede la supresión de una confesión solo porque el detenido fue llevado ante un magistrado luego de las 36 horas de haberse producido su arresto. Al analizar la totalidad de las circunstancias del recurso de epígrafe, adelantamos que esa demora, por sí sola, no causa que se suprima la evidencia.

I

El 25 de febrero de 2020, entre las 5:30 p.m. y las 6:00 p.m., la Policía de Puerto Rico arrestó al Sr. Pedro Marrero sin que mediara una orden judicial para ello, por tener motivos fundados para creer que

mató a tres personas. Mientras estuvo detenido, el señor Marrero confesó y se adjudicó los delitos investigados. Posteriormente, el 27 de febrero de 2020, el Ministerio Público presentó tres denuncias en su contra por asesinato en primer grado, en violación del Art. 93(a) del Código Penal de Puerto Rico. 33 LPRA sec. 5142. Además, le presentaron varias denuncias por violaciones de los Artículos 6.05, 6.06 y 6.14 de la Ley de Armas de Puerto Rico de 2020, Ley Núm. 168-2019, 25 LPRA sec. 466d, 466e y 466m, sobre portación, transportación o uso de armas de fuego sin licencia; portación y uso de armas blancas; y disparar o apuntar armas de fuego. Ese mismo día, el Tribunal de Primera Instancia encontró causa probable para arresto en todas las denuncias.

Luego de varios trámites, el 9 de marzo de 2021 el Pueblo presentó las acusaciones correspondientes. Finalmente, se escogió el 12 de agosto de 2021 como la fecha para comenzar el juicio. No obstante, el 23 de julio de 2021 el acusado radicó una *Moción de desestimación* al amparo de la Regla 64(p) de Procedimiento Criminal. Alegó que su identificación constituía prueba de referencia múltiple. El Ministerio Público se opuso. Tras la celebración de dos vistas para atender la moción, el foro primario la declaró no ha lugar.

Inconforme, el 27 de diciembre de 2021 el señor Marrero presentó una *Moción de identificación y confesión basado en la[s] Regla[s] de [P]rocedimiento Criminal* (Moción de supresión), en la cual solicitó la supresión de su

identificación y la eliminación de la confesión que ofreció bajo juramento. Sobre la identificación, reiteró que constituía prueba de referencia múltiple. En cuanto a la confesión, arguyó que su renuncia al derecho de no autoincriminarse ocurrió mientras estaba bajo una detención investigativa y privado de representación legal. Nuevamente el Estado se opuso.

Para afrontar la controversia, el Tribunal de Primera Instancia celebró una vista de supresión los días 12, 14, y 27 de enero, 10 de febrero y 1 de marzo de 2022. Finalmente, el 12 de mayo de 2022, la sala de instancia emitió una *Resolución* en la cual: (a) sostuvo la identificación del señor Marrero, y (b) **suprimió la confesión que prestó.**

A raíz de esta decisión, el Pueblo presentó una reconsideración, pero fue declarada no ha lugar. Por ello, recurrió al Tribunal de Apelaciones. Allí, el Ministerio Público expresó que el Tribunal de Primera Instancia erró al suprimir la confesión tomada al señor Marrero. Aseveró que la renuncia al derecho constitucional a no autoincriminarse fue inteligente, voluntaria, legal y sin coacción por parte del Estado. Por su parte, el señor Marrero defendió la determinación de supresión efectuada. Indicó que tal dictamen se basó en un análisis de las circunstancias que rodearon la producción de la confesión. Aseguró que la prueba que se presentó en la vista de supresión demostró que permaneció arrestado por un tiempo prolongado y excesivo,

así como que el Estado empleó mecanismos coercitivos para obtener la confesión.

El Tribunal de Apelaciones confirmó la supresión por entender que, del expediente y de la regrabación de la vista de supresión de evidencia, no surgieron hechos que demostraran que el señor Marrero renunció de forma voluntaria a su derecho contra la autoincriminación. Sentenció lo contrario, que hubo coacción y violencia por parte del Estado ya que: (1) al señor Marrero lo mantuvieron esposado y custodiado durante las 40 horas que estuvo detenido; (2) no lo llevaron ante un magistrado a pesar de que se negó a declarar en dos ocasiones; (3) le permitieron a una de las testigos de cargo dialogar con él, y (4) lo llevaron ante un magistrado luego de 40 horas bajo custodia, 4 horas en exceso del límite que establece el ordenamiento, sin justificación alguna para la demora.

En desacuerdo, el Ministerio Público presentó una solicitud de reconsideración en la que puntualizó que el acusado no fue obligado a confesar, sino que su declaración fue libre y voluntaria. Enfatizó que, si bien una confesión obtenida una vez transcurridas las 36 horas no es automáticamente inadmisible, en este caso el Estado no tendría ni siquiera que justificar la demora porque la confesión se obtuvo dentro de ese lapso. A pesar de sus argumentos, el foro apelativo intermedio denegó su reconsideración.

Insatisfecho, el Ministerio Público recurre ante nos para que revoquemos la supresión de la confesión. Señala que fue un acto consciente, inteligente, voluntario y sin coacción ni violencia. En cambio, el señor Marrero se opone. Afirma que las actuaciones de los agentes del orden público denotan una estrategia para obtener su confesión y que no se justifican las 40 horas que demoraron en trasladarlo ante la presencia de un magistrado.

Expedido el auto de <u>certiorari</u>, y con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

II

**A. <u>*Derecho contra la autoincriminación*</u>**

El derecho contra la autoincriminación ha sido catalogado como una de las garantías más trascendentales y fundamentales del derecho penal y del procedimiento criminal en Puerto Rico. <u>Pueblo v. Sustache Torres</u>, 168 DPR 350, 353-354 (2006). Emana de la Quinta Enmienda de la Constitución de Estados Unidos de América, que dispone "[n]o person... shall be compelled in any criminal case to be a witness against himself...". Emda. V, Const. EE. UU., LPRA, Tomo 1. Del mismo modo, la Constitución de Puerto Rico establece que nadie será obligado a incriminarse mediante su propio testimonio. Art. II, Sec. 11, Const. PR, LPRA, Tomo 1.

Este derecho implica que ninguna persona está obligada a contestar preguntas o emitir expresiones que la expongan al riesgo de enfrentar responsabilidad criminal. <u>Pueblo v. Millán Pacheco</u>, 182 DPR 595, 608 (2011). Si una persona es

compelida a incriminarse por medio de sus propias palabras, sus expresiones serán inadmisibles como evidencia en el juicio. E.L. Chiesa Aponte, *Derecho procesal penal de Puerto Rico y Estados Unidos*, Bogotá, Ed. Forum, 1993, Vol. I, Sec. 2.1, pág. 56.

Dada su relevancia, el derecho constitucional contra la autoincriminación constituye la protección más importante con la que cuenta todo ciudadano que enfrenta un interrogatorio como parte de una investigación criminal. Íd. Con esta protección se busca evitar que se someta a un individuo al cruel "trilema" de tener que escoger entre: (1) decir la verdad y acusarse a sí mismo; (2) mentir y ser hallado incurso en perjurio, o (3) rehusarse a declarar y ser hallado incurso en desacato. Pueblo v. Nieves Vives, 188 DPR 1, 19 (2013). Del mismo modo, se promueve que el Gobierno realice sus investigaciones criminales civilizadamente y que el sistema judicial no se contamine con métodos de procurar la verdad que lesionen la dignidad humana. Íd.

Ahora bien, como cualquier otro derecho, el derecho contra la autoincriminación no es absoluto y puede ser renunciado válidamente. Pueblo v. Viruet Camacho, 173 DPR 563, 571-573 (2008). Para que dicha renuncia sea válida debe ser voluntaria, producto de una elección libre, con consciencia del derecho abandonado y de las consecuencias que acarrea ese abandono. Íd., pág. 573. Es decir, la renuncia debe darse libre de toda coacción o violencia por parte del Estado. Pueblo v. Pérez Rivera, 186 DPR 845, 872

(2012). En ese sentido, la protección constitucional se extiende solamente a declaraciones compelidas, por lo que se admiten en evidencia las confesiones ofrecidas voluntariamente por el sospechoso. Pueblo v. Sustache Torres, supra, pág. 354.

Para asegurarse de que la renuncia al derecho contra la autoincriminación sea legítima, una vez la investigación criminal se centra sobre un sospechoso bajo custodia y previo a interrogarlo, el Estado está obligado a realizarle una serie de advertencias acerca de sus derechos constitucionales. Miranda v. Arizona, 384 US 436, 444 (1966); Pueblo v. Millán Pacheco, supra, págs. 609-610. Estas advertencias incluyen: (1) el derecho a guardar silencio; (2) que cualquier manifestación que realice podrá y será utilizada en su contra; (3) el derecho a consultar con un abogado durante el interrogatorio, y (4) el derecho a que se le asigne un abogado de oficio, de no contar con los recursos para sufragarlo. Íd. Véase, además, Pueblo v. Pérez Rivera, supra, pág. 872; Pueblo v. Nieves Vives, supra, pág. 22.

Nuestro ordenamiento no requiere que los oficiales del orden público realicen una expresión específica o utilicen un lenguaje talismánico al momento de realizar las advertencias. Pueblo v. Viruet Camacho, supra, pág. 574. Lo medular es que se cumpla con el propósito de que el detenido comprenda lo que implica su renuncia al derecho contra la

autoincriminación. Íd., pág. 574; Pueblo v. Medina Hernández, 158 DPR 489, 504-505 (2003).

Así, una confesión es inadmisible por violar el derecho contra la autoincriminación cuando se satisfacen todos los requisitos siguientes: (1) al momento de obtenerse la declaración impugnada ya la investigación se había enfocado en la persona en cuestión y esta era considerada como sospechosa de la comisión del delito; (2) al momento de prestar la declaración el sospechoso se encontraba bajo custodia del Estado; (3) la declaración es producto de un interrogatorio realizado con el fin de obtener manifestaciones incriminatorias, y (4) no se le advirtió al detenido sobre los derechos constitucionales que nuestro ordenamiento le garantiza. Pueblo v. Viruet Camacho, supra, pág. 574.

A la hora de evaluar la validez de una renuncia al derecho contra la autoincriminación, los tribunales deben considerar la totalidad de las circunstancias. Pueblo v. Pérez Rivera, supra, pág. 872; Pueblo v. Ruiz Bosch, 127 DPR 762, 776 (1991). Por esto, el análisis sobre la validez de una confesión debe realizarse caso a caso y ningún factor será concluyente, por sí solo, para arribar a cualquier determinación. Algunos de los factores que se pueden utilizar para auscultar si una confesión se obtuvo de manera voluntaria o coaccionada son: si se impartieron las advertencias legales; la evaluación de las circunstancias personales y particulares del sospechoso; el daño físico o

psicológico infringido; el periodo de tiempo que estuvo bajo custodia previo a prestar la confesión, y la conducta de la policía mientras estuvo bajo custodia. Además, puede tomarse en cuenta si el declarante tuvo asistencia de un abogado al prestar la confesión; si hubo un interrogatorio ininterrumpido durante todo el día y la noche; si el interrogatorio estuvo a cargo de varios policías armados, o si se utilizó el sistema de turnos. Asimismo, se pudiera observar si, desde el arresto hasta la declaración, el detenido estuvo completamente incomunicado de sus familiares, amigos o personas ajenas a la policía; la presión producida por la presencia de un gentío hostil; la capacidad psicológica del sospechoso para resistir las presiones a las que estuco sujeto, entre otras. _Pueblo v. Viruet Camacho_, _supra_, pág. 574; _Pueblo v. Medina Hernández_, _supra_, pág. 507; _Pueblo v. Meléndez_, 80 DPR 787, 796-797 (1958).

En este análisis, cuando existe una controversia en cuanto a la voluntariedad y admisión de una confesión, el peso de la prueba recae en el Ministerio Público, quien debe probar que la confesión constituye una renuncia válida al derecho contra la autoincriminación. _Pueblo v. Millán Pacheco_, _supra_, pág. 612. Tan es así que, en ciertas circunstancias, se requiere que la evidencia que presente el Ministerio Público demuestre que las advertencias legales se efectuaron y que no medió coacción al momento de prestar la confesión. _Pueblo v. Viruet Camacho_, _supra_, pág. 575; _Pueblo v. Ruiz Bosch_, _supra_, págs. 776-777.

De todas maneras, las advertencias legales no son suficientes para sostener la validez de una confesión cuando el sospechoso hubiese reclamado expresamente su derecho a asistencia de abogado. Edwards v. Arizona, 451 US 477, 484-485 (1981). Según expone el profesor Chiesa, cuando un sospechoso indica que desea la asistencia de un abogado, el interrogatorio no puede comenzar (y si ya ha comenzado, no puede continuar) hasta que el abogado esté presente. Entonces, no podrá la Policía abordar posteriormente al sospechoso, aunque le imparta nuevamente las advertencias. Será necesaria la presencia de un abogado, salvo que el sospechoso sea quien inicie el acercamiento con la policía. E.L. Chiesa Aponte, *Procedimiento Criminal y la Constitución: Etapa Investigativa*, Ediciones Situm, San Juan, 2017, págs. 58-59. Nótese que esto es distinto al caso en donde el sospechoso solo expresa que desea guardar silencio, sin invocar asistencia de abogado. En este caso, los agentes del orden público, luego de un tiempo razonable, podrán iniciar otro interrogatorio, impartiéndole al sospechoso las advertencias nuevamente. Íd.; Michigan v. Mosley, 423 US 96, 104-107 (1975) (Dos horas constituía tiempo razonable para permitir comenzar otro interrogatorio y volver a impartir las debidas advertencias.).

### B. *Arresto sin orden judicial*

En nuestro ordenamiento jurídico, como regla general, se prohíbe el arresto de personas y los registros o allanamientos sin una orden judicial previa apoyada en una

determinación de causa probable. Pueblo v. Nieves Vives, supra, pág. 12. Sin embargo, este requerimiento no es absoluto, de manera que existen excepciones que reconocen la validez de un arresto sin orden judicial. Íd., pág. 13; Pueblo v. Calderón Díaz, 156 DPR 549, 556 (2002). Dichas excepciones están comprendidas en la Regla 11 de Procedimiento Criminal, 34 LPRA Ap. II, que establece:

**Regla 11. Arresto por un funcionario del orden público**
Un funcionario del orden público podrá hacer un arresto sin la orden correspondiente:

(a) Cuando tuviera motivos fundados para creer que la persona que va a ser arrestada ha cometido un delito en su presencia. En este caso deberá hacerse el arresto inmediatamente o dentro de un término razonable después de la comisión del delito. De lo contrario el funcionario deberá solicitar que se expida una orden de arresto.
(b) Cuando la persona arrestada hubiese cometido un delito grave (felony), aunque no en su presencia.
(c) Cuando tuviere motivos fundados para creer que la persona que va a ser arrestada ha cometido un delito grave (felony), independientemente de que dicho delito se hubiere cometido o no en realidad.

En el pasado hemos manifestado que el término *motivos fundados* significa "la posesión de aquella información o conocimiento que lleva a una persona ordinaria y prudente a creer que la persona a ser detenida ha cometido o va a cometer un delito". Pueblo v. Calderón Díaz, supra, pág. 557.

De esta forma, el arresto del señor Marrero, aunque sin orden judicial, no estaba prohibido por ley. Según vimos, la Regla 11 de Procedimiento Criminal, supra, permite la detención sin orden cuando los oficiales tengan motivos fundados para entender que la persona arrestada ha cometido un delito grave (*felony*). Así, cuando los agentes dieron con el señor Marrero a eso de las 6:00 p.m. del 25 de febrero de 2020, y este se ajustaba a perfección con la localización, las características físicas y la vestimenta del sospechoso de la masacre investigada, esos motivos fundados justificaban la intervención y el arresto ejecutado. En ese sentido, en este caso **no hubo una detención ilegal.**

Ahora bien, la Regla 22 de Procedimiento Criminal, 34 LPRA Ap. II, establece que, luego de efectuado un arresto sin orden, es necesario obtener sin demora innecesaria una determinación judicial que convalide la legalidad del arresto, los motivos fundados del agente y la existencia de justa causa para el arresto. Pueblo v. Pérez Rivera, supra, págs. 860-861; Pueblo v. Aponte Nolasco, 167 DPR 578, 583 (2006).[1]

Este requisito proviene de la Cuarta Enmienda de la Constitución de Estados Unidos. Gerstein v. Pugh, 420 US 103 (1975). Sobre esto, el Tribunal Supremo Federal estableció

---

[1] Si bien en Pueblo v. Díaz De León, 176 DPR 913 (2009), revisamos una parte de Pueblo v. Aponte Nolasco, supra, esa revisión se limitó a atender los mecanismos procesales disponibles al Estado cuando este obtiene una determinación adversa en etapa de causa para arresto y vista preliminar. La doctrina sobre la necesidad que tiene el Estado de llevar a una persona arrestada sin orden ante un magistrado se mantuvo inalterada.

que una persona arrestada sin una orden judicial debe conducirse ante un magistrado dentro de un periodo de 48 horas tras su arresto. County of Riverside v. McLaughlin, 500 US 44 (1991). De este modo, si la determinación judicial de causa probable se realiza dentro de las 48 horas siguientes a la detención, la continuación de la detención se presume válida. Chiesa Aponte, *Procedimiento Criminal y la Constitución: Etapa Investigativa*, op. cit., pág. 336. Por el contrario, si se hace ya trascurrido ese periodo, la presunción es de irrazonabilidad o invalidez de la detención. Íd.

No obstante, tras un análisis del funcionamiento de nuestros tribunales y de la Regla 22 de Procedimiento Criminal, establecimos que en Puerto Rico el término máximo que tiene el Estado para conducir a una persona arrestada sin una orden judicial ante un magistrado es de 36 horas. Pueblo v. Aponte Nolasco, supra, pág. 585. Cualquier demora en exceso de este término se presume injustificada, aunque en circunstancias excepcionales el Estado podría justificar una dilación mayor. Íd., pág. 586.

C. ***Confesiones tras un arresto sin orden judicial***

La Regla 22 de Procedimiento Criminal, supra, que dispone para que el arrestado sea conducido ante un magistrado sin demora innecesaria, no alude a una regla de exclusión de evidencia como consecuencia de la dilación. Chiesa Aponte, *Procedimiento Criminal y la Constitución: Etapa Investigativa*, op. cit., pág. 115. Empero, en Pueblo

v. Fournier, 77 DPR 222 (1954), decidimos que siempre y cuando una confesión sea voluntaria, ésta no va a dejar de ser admisible en evidencia por el simple hecho de que se hizo durante el periodo de la detención ilegal. Véase Chiesa Aponte, *Procedimiento Criminal y la Constitución: Etapa Investigativa*, op. cit., pág. 115. En estas circunstancias, el punto decisivo es la voluntariedad de la confesión y no la ilegalidad de la detención. Pueblo v. Fournier, supra, pág. 256. También hemos recalcado que la práctica de la detención ilegal debe erradicarse por otros medios que no sean el de permitir que el culpable se libere de su castigo a pesar de que ha confesado voluntariamente su culpabilidad. Íd.

Por su pertinencia al tema, citaremos *in extenso* parte de nuestras expresiones en Pueblo v. De Jesús Cabrera, 94 DPR 450, 460 (1967):

> El otro apuntamiento básico de impugnación --la demora en conducirlos ante un magistrado-- **se diluye al considerar en conjunto todos los hechos**. Precisa antes repetir lo expresado en Pueblo v. Martínez Figueroa, 86 DPR 413 (1962), citando con aprobación de Fournier y Meléndez, supra, al efecto de que el fiscal puede interrogar a un presunto acusado, **antes o después de su arresto**, durante un período razonable, y que **la detención por muchas horas por sí sola no es suficiente para viciar una confesión**. A este respecto **es necesario establecer un equilibrio deseable** entre el reconocimiento que merecen los derechos del acusado y el valor social que representa la protección de orden público en el esclarecimiento de los actos delictivos. (Negrillas suplidas).

Por ello, al momento de analizar la admisibilidad de una confesión, más que limitarnos a si se cumplió o no con

el término máximo que tiene el Estado para conducir a una persona arrestada ante un magistrado, es necesario evaluar la voluntariedad de la expresión por medio de un examen de la totalidad de las circunstancias. Así lo concluimos en Pueblo v. Fournier, supra, pág. 257, cuando enunciamos que el uso de una confesión obtenida por medio de coacción está prohibido por la cláusula constitucional del debido proceso de ley. El elemento crucial es la coacción que hace involuntaria la confesión, por lo que una confesión extrajudicial voluntaria y libre de toda coacción no viola el debido proceso de ley de un sospechoso. Chiesa Aponte, *Procedimiento Criminal y la Constitución: Etapa Investigativa*, op. cit., pág. 48; Pueblo v. Viruet Camacho, supra, pág. 572. Incluso, en Pueblo v. Martínez Figueroa, 86 DPR 413, 416-417 (1962), confirmamos la admisión de unas declaraciones de varios acusados cuando sentenciamos que

> **aun admitiendo** para los fines de la discusión que los apelantes fueron **detenidos ilegalmente** por no estar provistos los agentes de mandamiento de arresto y orden de citación, todas las circunstancias indican que sus declaraciones fueron **voluntarias y espontáneas**, que no medió el grado de coacción física o psicológica que tiñe de ilegalidad. (Negrillas suplidas).

III

En el recurso ante nuestra consideración, el Estado arguye que el Tribunal de Apelaciones erró al sostener la supresión de la confesión del señor Marrero. Indica que la confesión fue producto de una renuncia voluntaria, consciente e inteligente del derecho contra la

autoincriminación, sin que mediaran acciones coercitivas ni violencia por parte del Gobierno. Le asiste la razón, lo que comprobamos al examinar la cronología de eventos que surgen del expediente y de la grabación de la vista de supresión de evidencia:

**martes, 25 de febrero de 2020**

> <u>5:30 p.m. a 6:20 p.m.</u> - Los agentes Prieto Cosme y Padilla Correa arrestaron al señor Marrero en la Carretera #165 de Toa Alta sin una orden judicial, bajo los motivos fundados de que cometió varios delitos graves.[2] El sospechoso cumplía con la vestimenta y las descripciones físicas con las que contaban los agentes.[3]
>
> Los agentes Prieto Cosme y Padilla Correa, al detener al sospechoso, le hicieron las advertencias de ley por <u>primera vez</u>. El señor Marrero se mantuvo en silencio.[4]
>
> Acto seguido, los agentes trasladaron al señor Marrero al cuartel de Toa Alta, donde lo identificaron y le preguntaron por el paradero del revólver utilizado. El sospechoso negó los hechos.[5]
>
> <u>9:50 p.m.</u> – Varias horas después de que los agentes Prieto Cosme y Padilla Correa le hicieran las primeras advertencias al sospechoso, la Agte. Vivian Acevedo Jiménez, quien fungía como investigadora de los hechos relacionados con el caso, le hizo las advertencias legales por <u>segunda vez</u>. Luego de explicarle las advertencias, el señor Marrero expresó que no quería hablar y marcó que no renunciaba a sus

---

[2] Regrabación de vista de supresión de evidencia, 14 de enero de 2022, 10:12:28 a.m. – 10:15:26 a.m.; Regrabación de vista de supresión de evidencia, 12 de enero de 2022, 9:58:40 a.m. – 9:59:57 a.m.; Denuncias contra el Sr. Pedro Marrero, Ap. del certiorari, págs. 43-49.
[3] Regrabación de vista de supresión de evidencia, 12 de enero de 2022, 10:50:09 a.m. – 10:50:35 a.m.
[4] Regrabación vista de supresión de evidencia, 12 de enero de 2022, 9:59:35 a.m. – 10:00:17 a.m.; 10:56:49 a.m. – 10:57:44 a.m.
[5] <u>Íd.</u>, 9:59:35 a.m. – 10:00:17 a.m.; Ap. del certiorari, pág. 123.

derechos. Sin embargo, nunca solicitó la asistencia de un abogado.[6]

En algún momento de la noche - la agente Acevedo entrevistó a la Sra. Rossy Marrero Mojica (Rossy), hija del señor Marrero.[7]

**miércoles, 26 de febrero de 2020**

12:00 a.m. - La agente Acevedo trasladó al señor Marrero a la Comandancia de Bayamón y, a su llegada, lo ingresó en una celda.[8] El señor Marrero se encontraba detenido como sospechoso de dar muerte a tres personas.[9]

1:00 a.m. - La agente Acevedo entrevistó formalmente a la hija del señor Marrero, Rossy, en la Comandancia de Bayamón.[10]

3:20 a.m. – La exfiscal Janet Parra le tomó una declaración jurada a la hija del señor Marrero, Rossy, en la Comandancia de Bayamón.[11]

12:00 p.m. (aproximadamente) - Los hijos del señor Marrero, María Milagros (Tati), José Javier y Rossy, acudieron a la Comandancia de Bayamón. Tati le llevó almuerzo. Rossy, quien era testigo del Ministerio Público, le llevó ropa. Tati y José Javier tuvieron acceso directo al señor Marrero y pudieron hablar con él.[12] **En cambio, Rossy, la única hija que las autoridades habían entrevistado, no habló con el acusado.**[13]

5:00 p.m. (aproximadamente) – Tras la visita y conversación con sus hijos María Milagros (Tati) y José Javier, el señor Marrero le indicó al teniente Alvarado —otro agente que se encontraba en la comandancia— que quería hablar con la fiscal del caso. El teniente Alvarado así se lo comunicó a la agente Acevedo.[14]

5:03 p.m. – Por tercera ocasión, la agente Acevedo le hizo las advertencias legales al señor

---

[6] Íd., 11:30:15 a.m. – 11:32:10 a.m.
[7] Regrabación de vista de supresión de evidencia, 14 de enero de 2022, 10:06:53 a.m. – 10:07:37 a.m.
[8] Íd., 10:01:08 a.m. – 10:01:24 a.m.
[9] Íd., 10:47:58 a.m. – 10:48:31 a.m.
[10] Íd., 10:06:53 a.m. – 10:07:37 a.m.
[11] Íd., 10:50:50 a.m. – 10:51:52 a.m.
[12] Regrabación vista de supresión de evidencia, 12 de enero de 2022, 11:46:15 a.m. – 11:50:00 a.m.; 11:53:30 a.m. – 11:55:20 a.m.; Ap. del certiorari, pág. 124.
[13] Íd., 11:53:30 a.m. – 11:54:30 a.m.
[14] Íd., 11:52:45 a.m. – 11:54:15 a.m.; 11:54:45 a.m. – 11:56:30 a.m.

Marrero. Estuvo presente su hija Tati, cuya firma aparece en el documento de las advertencias. El señor Marrero hizo las primeras declaraciones y la agente Acevedo tomó nota.[15]

En algún momento de la noche – Policías trasladaron al señor Marrero al Centro Metropolitano de Investigaciones (CEMI).[16]

11:20 p.m. – Por cuarta ocasión se le hicieron las advertencias legales al señor Marrero. La exfiscal Parra le tomó su declaración jurada en el CEMI. Estuvieron presentes la agente Acevedo y su hija Tati, quienes figuran como testigos de la declaración jurada.[17]

En su declaración, el sospechoso aceptó su culpabilidad y se adjudicó las tres muertes en cuestión. En lo que concierne a esta controversia, verbalizó:

> En el Cuartel de Toa Alta no me trataron muy bien, pero en Bayamón me trataron con respeto y una cosa seria. El Teniente Alvarado me dio el 'break' de poder hablar con mis hijos. Hablé con mis hijos y luego, cuando hablé con el teniente le dije que quería decir las cosas como pasaron. En la única oportunidad que yo tuve de narrar fue cuando llegó usted (la fiscal) a entrevistarme. Ustedes aquí, en la comandancia de acá, se han portado como verdaderos oficiales, con respeto a las personas que van a entrevistar… Hablando francamente, aunque nos hemos reído y yo he llorado, me ha hecho sentir bastante tranquilo. Me siento en confianza y eso me da tranquilidad. Estoy conforme de la forma en que me han explicado las cosas.[18]

**jueves, 27 de febrero de 2020**

10:55 a.m. – Agentes de la Policía llevaron al señor Marrero ante un magistrado, quien encontró causa probable para arresto en las siete denuncias presentadas en su contra.[19]

---

[15] Íd., 11:56:40 a.m. – 11:58:42 a.m.; 12:03:03 p.m. - 12:03:45 p.m.
[16] Íd., 12:03:15 p.m. – 12:04:20 p.m.
[17] Íd., 11:57:21 a.m. – 11:59:00 a.m.
[18] Ap. del certiorari, págs. 123-124
[19] Regrabación de vista de supresión de evidencia, 14 de enero de 2022, 10:13:03 a.m. -10:13:23 a.m.; Denuncias contra el Sr. Pedro Marrero, Ap. del certiorari, págs. 43-49.

Tras analizar la totalidad de las circunstancias podemos concluir que la renuncia del señor Marrero a su derecho contra la autoincriminación fue válida, voluntaria y sin que el Estado la haya procurado mediante el empleo de tácticas coercitivas.

Como vimos, si un arresto se realiza sin orden judicial, el Estado cuenta con 36 horas para llevar al sospechoso ante un magistrado para que este convalide su detención. Pueblo v. Aponte Nolasco, supra, pág. 585. Sin embargo, la Regla 22(a) de Procedimiento Criminal no alude a la exclusión de evidencia como consecuencia de una dilación injustificada. Por ello, siempre y cuando una confesión sea voluntaria, esta no va a dejar de ser admisible en evidencia por el simple hecho de que se hizo durante el periodo de la detención ilegal. Pueblo v. Fournier, supra, pág. 256.

A pesar de esto, tanto el foro apelativo intermedio como el señor Marrero en su alegato, para justificar la supresión, adjudican erróneamente una consideración significativa al hecho de que el imputado fue llevado ante un magistrado a las 40 horas de su arresto. Es decir, cuatro horas en exceso del límite que establece el ordenamiento. Sin embargo, pasan por alto el hecho de que una confesión obtenida una vez transcurridas las 36 horas desde el arresto no es automáticamente inadmisible. El punto decisivo es la voluntariedad de la confesión frente a la totalidad de las

circunstancias, y no exclusivamente la ilegalidad de la detención. Íd.

Más aún, en el caso de epígrafe la confesión no se produjo transcurridas ya las 36 horas. Según surge de los hechos considerados, el arresto del señor Marrero se produjo el martes, 25 de febrero de 2020, a eso de las 6:00 p.m. Sus primeras declaraciones sobre los hechos en cuestión fueron realizadas el miércoles, 26 de febrero de 2020, a eso de las 5:00 p.m. Por último, a las 11:20 p.m. de ese mismo día, el sospechoso prestó su declaración jurada en donde confesó la comisión de los delitos imputados. Como vemos, a lo sumo transcurrieron 29 horas desde el arresto del señor Marrero hasta su confesión. Por eso, el Estado no tenía que justificar el exceso de las 36 horas para sostener la confesión, puesto que se obtuvo dentro de ese periodo. Evidentemente resulta en un desacierto considerar que el tiempo **posterior a la confesión** que el sospechoso estuvo sin comparecer ante un magistrado influyó o creó un ambiente de coacción que lo motivó a emitir la declaración que ya había emitido. Eso no tiene sentido.

Por consiguiente, más que centrarnos en la duración de la detención, debemos enfocarnos en la voluntariedad de la confesión. Para realizar este análisis sobre la admisibilidad de las confesiones obtenidas luego de que medie un arresto sin orden, el Tribunal Supremo de los Estados Unidos estableció cuatro factores que deben observarse: (1) si se hicieron las advertencias legales; (2)

la proximidad temporal entre la intervención ilegal y la confesión; (3) la presencia de circunstancias interventoras, y (4) el propósito y flagrancia de la conducta ilegal desplegada por el Estado. Brown v. Illinois, 422 US 590, 603-604 (1975). Estos criterios deben observarse en conjunto, bajo un análisis de la totalidad de las circunstancias, y ninguno de ellos es concluyente a la hora de determinar la admisibilidad de una confesión. Esta doctrina aplica en Puerto Rico, según establecimos en Pueblo v. Nieves Vives, supra.

En cuanto al primer criterio, al señor Marrero le realizaron las "advertencias Miranda" en cuatro ocasiones previo a su confesión. La primera advertencia se hizo al momento del arresto, a eso de las 6:20 p.m. del 25 de febrero de 2020. **El sospechoso guardó silencio**. La segunda fue a las 9:20 p.m. de ese mismo día, cuando la agente Acevedo, a quien se le asignó la investigación de la masacre, acudió por primera vez ante el señor Marrero. En esta ocasión el detenido expresó que **no quería hablar**. La tercera fue a las 5:03 p.m. del 26 de febrero de 2020, tras el acercamiento del señor Marrero para **informar su deseo de confesar**. Por último, a las 11:20 p.m. del 26 de febrero de 2020 se le advirtió al sospechoso **por cuarta ocasión** de sus derechos cuando este, en presidencia de la fiscal Parra, de la agente Acevedo y de su hija Tati, prestó formalmente la declaración jurada en la que aceptó la comisión de los asesinatos.

Evidentemente, al señor Marrero sí se le hicieron las advertencias legales. Debemos recordar que, conforme a lo discutido, guardar silencio, expresar que no se renuncia a los derechos o manifestar que no se desea declarar, no impiden que el Estado realice intentos posteriores para tratar de interrogar al sospechoso nuevamente. De esta manera, erró el Tribunal de Apelaciones al cuestionar: "¿[c]uántas veces el señor Marrero tenía que invocar su derecho a guardar silencio?". Sentencia, pág. 19; Ap. del certiorari, pág. 239.

Acorde a la jurisprudencia, la policía puede abordar a un sospechoso después de un tiempo razonable desde que este manifestó que no quiere hablar y luego que se impartan de nuevo las advertencias. Michigan v. Mosley, supra, págs. 104-107; Chiesa Aponte, *Procedimiento Criminal y la Constitución: Etapa Investigativa*, op. cit., pág. 72. No obstante, si el detenido invoca su derecho a estar asistido por un abogado, el interrogatorio no puede efectuarse o debe detenerse inmediatamente. La Policía no podría posteriormente abordar al sospechoso, aunque le imparta nuevamente las advertencias, salvo que sea el sospechoso quien inicie el acercamiento con los agentes del orden público. Íd.

Sin embargo, en este caso, se desprende del expediente que el señor Marrero en **ningún momento solicitó la asistencia de abogado**, aunque se le informó de su derecho a hacerlo. Por esta razón, era conforme al debido proceso de ley que el

Estado abordara en más de una ocasión al sospechoso y le hiciera nuevamente las debidas advertencias de ley, sobre todo, tras considerar que entre cada acercamiento transcurrieron **varias horas**. Incluso, los hechos demuestran que después de que el sospechoso manifestó que deseaba guardar silencio, los agentes respetaron su decisión y no lo abordaron nuevamente. No fue hasta que el propio señor Marrero exteriorizó su deseo de confesar, renunciando libre y voluntariamente a su derecho de guardar silencio, que los oficiales lo abordaron de nuevo y le impartieron las debidas advertencias.

Por otra parte, en cuanto a los criterios dos y tres (proximidad temporal entre la intervención ilegal y la confesión; presencia de circunstancias interventoras), la jurisprudencia no ha establecido cuál es el tiempo necesario que debe transcurrir entre el arresto y la confesión. Pueblo v. Nieves Vives, supra, pág. 24. Empero, en la medida en que el tiempo entre el arresto y la confesión es menor, menor es también la probabilidad de que existan causas interventoras. Íd. La causa interventora es un evento que ocurre luego del arresto ilegal, pero antes de la confesión, y tiene el efecto de interrumpir la cadena que existe entre ese arresto y la confesión. Íd. Por lo general, una causa interventora es un suceso independiente a la ilegalidad del arresto, como puede ser el consultar con un abogado. Al analizar este factor, lo importante es observar si los acontecimientos que ocurren entre el arresto y la confesión son suficientes e

independientes para poder romper la cadena entre el arresto sin orden y la confesión que se produjo. Íd. pág. 25.

En el caso de marras transcurrieron 29 horas entre el arresto del señor Marrero y su confesión, lo que supone tiempo suficiente para que ocurran causas interventoras que interrumpan el vínculo entre ambos acontecimientos. Tanto es así que aquí sí hubo circunstancias interventoras. Del expediente surge que el detenido solicitó tiempo para dialogar con sus hijos y que, **después de esa conversación**, "quería decir las cosas como pasaron". Ap. del certiorari, págs. 123-124. Dicho por el propio sospechoso, las causas interventoras que lo motivaron a prestar su confesión fueron las múltiples interacciones que tuvo con sus hijos María Milagros (Tati) y José Javier (**quienes no eran testigos del Ministerio Público**). Nunca conversó con su tercera hija, Rossy, quien sí era testigo de cargo. Por eso se puede aseverar con certeza que fueron estas circunstancias interventoras, y no el arresto sin orden, las que significativamente contribuyeron a que se emitiera la confesión erradamente suprimida.

El último criterio invita a analizar la conducta de los oficiales en este caso. La jurisprudencia establece que la acción del Gobierno no puede constituir un intento flagrante de beneficiarse injustamente de su propio acto ilegal. En otras palabras, para que una confesión obtenida tras un arresto sin motivos fundados pueda prevalecer como prueba sustantiva, la evidencia presentada por el Ministerio

Público debe demostrar que el propósito de los agentes al diligenciar el arresto ilegal no era, precisamente, obtener dicha confesión. Pueblo v. Nieves Vives, supra, pág. 25.

Primero, ya concluimos que los agentes de la Policía tenían motivos fundados para arrestar al señor Marrero por considerarlo sospechoso de cometer tres asesinatos. Por eso, no cabe hablar de que la detención ilegal iba dirigida a obtener una confesión producto de una intervención sin motivos fundados. En segundo lugar, el detenido en ningún momento manifestó que confesó porque los agentes lo obligaron a confesar. Todo lo contrario, declaró que en la comandancia se comportaron como "verdaderos oficiales", que lo trataron "con respeto" y que lo hicieron sentir "bastante tranquilo" y "en confianza". Ap. del certiorari, pág. 124. Aseveró sentirse "conforme de la forma en que me han explicado las cosas". Íd. No surge que se hayan aprovechado de su edad avanzada o de su baja escolaridad. En todo momento ratificó comprender el proceso que enfrentaba, afirmó que sabía leer y escribir, que se sentía bien de salud y que no padecía de condición mental alguna ni se encontraba bajo el efecto de sustancias controladas. Manifestó que prestaba su declaración libre y voluntariamente. Tampoco se le mantuvo incomunicado ni aislado completamente de sus familiares. Así, no surge del récord que el Estado coaccionara o desplegara conducta flagrante dirigida a obtener la confesión del señor Marrero. En fin, la confesión es

voluntaria y, por tanto, admisible en evidencia, por estar ausente el elemento de coacción.

Pese a esto, el Tribunal de Apelaciones concluyó que el Estado compelió una confesión que violó el debido proceso de ley y el privilegio contra la autoincriminación. Sostuvo su determinación por entender que, en resumen: al acusado lo llevaron ante un magistrado a las 40 horas de custodia, 4 horas en exceso del límite que establece el ordenamiento; se insistió en proveerle las advertencias legales una y otra vez; supuestamente permitieron que una de las testigos de cargo dialogara con él; se le incautó su ropa; lo ubicaron en una celda; tres policías y un fiscal, utilizando el sistema de turnos, lo interrogaron y efectuaron intentos de interrogatorios durante todo un día y una noche; no tuvo abogado desde el arresto hasta que firmó la declaración; es carpintero y, tiene 77 años.

Esta conclusión del foro apelativo no merece nuestra deferencia porque no está respaldada por la evidencia ni por la jurisprudencia. Como mencionamos anteriormente, la confesión en cuestión se obtuvo a las 29 horas de la detención, por lo que es improcedente considerar que las próximas once horas que estuvo el señor Marrero sin acudir ante un magistrado afectaron la decisión que él ya había tomado y la declaración que ya había prestado.

Del mismo modo, vimos que los agentes del orden público pueden abordar en más de una ocasión al sospechoso y hacerle nuevamente las debidas advertencias de ley, siempre y cuando

el detenido no exprese inequívocamente su deseo de asistencia de abogado. En el caso de epígrafe, no surge de la prueba que el señor Marrero hubiera invocado su derecho a la asistencia de abogado, por lo que tampoco es contra la ley que este no tuviera abogado desde el arresto hasta que firmó la declaración.

Asimismo, contrario a la determinación de los foros hermanos, ni del récord ni del testimonio de la agente Acevedo se desprende que Rossy, hija del señor Marrero y testigo de cargo del Ministerio Público, se haya comunicado con su padre para influenciarlo o motivarlo a que prestara su confesión. Es todo lo opuesto, ya que la agente aseveró en varias ocasiones que **la testigo no habló** con el sospechoso y que solamente se limitó a llevarle ropa, pues la del señor Marrero sería incautada por su valor probatorio. Por lo tanto, el Tribunal de Apelaciones partió de una premisa equivocada y de hechos que no están en el expediente cuando expresó que los oficiales públicos permitieron que una de las testigos de cargo dialogara con el detenido.

Por último, se considera un "sistema de turnos" aquel interrogatorio que se realiza de forma **ininterrumpida**, en el que no haya periodos de descanso y en el que los agentes se alternen para fatigar al sospechoso. Véanse, Spano v. New York, 360 US 315, 321-323 (1959); Ashcraft v. Tennessee, 322 US 143, 149-153 (1943); Watts v. Indiana, 338 US 49, 52-53 (1949). De esta manera, no puede considerarse que aquí se llevó a cabo un sistema de turnos. Tampoco se efectuaron

intentos de interrogatorio que duraron todo el día y la noche. En realidad, los acercamientos que se le hicieron al señor Marrero fueron con varias horas de diferencia y los intentos de interrogarlo culminaron tan pronto este indicó que no quería hablar. La confesión, lejos de ser producto de un sistema de turnos, fue un acto voluntario al que arribó tras conversar con dos de sus tres hijos. Ninguno de ellos era testigo de cargo.

En conclusión, a la luz de la totalidad de las circunstancias, la renuncia del señor Marrero a su derecho contra la autoincriminación fue válida, consciente e inteligente. Del expediente, y en particular de los testimonios que surgen de la regrabación de la vista de supresión, no surge que la confesión se hubiere obtenido mediante coacción, intimidación o violencia por parte del Estado. Ante estos hechos, solo podemos concluir que el testimonio del señor Marrero es admisible en evidencia, porque se debió exclusivamente a un acto legítimo de conciencia, remordimiento y honestidad.

## IV

Por los fundamentos antes expuestos, se revoca el dictamen del Tribunal de Apelaciones que confirmó la determinación emitida por el Tribunal de Primera Instancia mediante la cual se suprimió la confesión del señor Marrero. Se devuelve el caso al foro primario para que los procedimientos continúen de forma compatible con lo aquí dispuesto.

Se dictará Sentencia en conformidad.


RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

     Peticionario

        v.               CC-2023-0102

Pedro Marrero

     Recurrido

SENTENCIA

En San Juan, Puerto Rico, a 29 de diciembre de 2023.

Por los fundamentos antes expuestos en la Opinión que antecede, la cual se hace formar parte de esta Sentencia, se revoca el dictamen del Tribunal de Apelaciones que confirmó la determinación emitida por el Tribunal de Primera Instancia mediante la cual se suprimió la confesión del señor Marrero. Se devuelve el caso al foro primario para que los procedimientos continúen de forma compatible con lo aquí dispuesto.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Estrella Martínez emitió una opinión disidente a la cual se unió el Juez Asociado señor Colón Pérez. La Jueza Presidenta Oronoz Rodríguez no interviene.

Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Pedro Marrero<br><br>Recurrido | CC-2023-0102 | Certiorari |

Opinión disidente emitida por el Juez Asociado Señor ESTRELLA MARTÍNEZ, al cual se une el Juez Asociado Señor COLÓN PÉREZ.

En San Juan, Puerto Rico, a 29 de diciembre de 2023.

**La totalidad de las circunstancias en las cuales se enmarcó la toma de la confesión que motiva este recurso evidencia que esta se obtuvo a través de mecanismos indebidos de coacción.** Y es que al examinar estas circunstancias resalta que, al hoy acusado, se le arrestó sin que mediara una orden judicial, que aun cuando el Estado contaba con elementos de prueba para presentar la correspondiente denuncia no lo llevó prontamente ante un magistrado, que se le mantuvo esposado ininterrumpidamente por veintinueve (29) horas mientras se le transfería continuamente entre cuarteles y que se le despojó de su vestimenta. A ese panorama hay que agregarle que el Estado, a pesar de conocer que la persona detenida le manifestaba que no renunciaba a sus derechos, continuó efectuando interrogatorios sin presencia de un representante legal y

permitió que una persona testigo del ministerio público interactuara con el acusado.

Son estas la totalidad de las circunstancias que sopesaron correctamente el Tribunal de Primera Instancia y el Tribunal de Apelaciones para arribar a la conclusión más razonable en este caso: **la renuncia al derecho a la no autoincriminación que precedió a la confesión no fue producto de un ejercicio voluntario, consciente e inteligente y, por tanto, procedía suprimir esta evidencia.**

Sin embargo, el dictamen que hoy emite este Tribunal establece un precedente preocupante para las garantías constitucionales de las personas que son objeto de una pesquisa policiaca. Ello debido a que hoy se valida que el Estado utilice tácticas evidentemente coercitivas contra una persona bajo su custodia con el objetivo de forzar una renuncia a la protección constitucional contra la no autoincriminación y así despejar el camino hacia la obtención de una declaración incriminatoria. **Me niego a consentir tal proceder. Por tanto, respetuosamente disiento.**

Expuesta la médula de esta controversia, procedo a detallar los fundamentos jurídicos que orientan mi postura.

**I**

**A.**

**El derecho a un debido proceso de ley prohíbe que se empleen mecanismos de coacción mental o física hacia una persona sospechosa de delito con el objetivo de obtener declaraciones que resulten incriminatorias**. Pueblo v. Viruet Camacho, 173 DPR 563, 570 (2008). Entonces, para que sea admisible la declaración o la confesión de una persona, producto de un interrogatorio, tiene que estar ausente el elemento de la coacción.

Lo anterior responde al derecho contra la autoincriminación consagrado tanto en la Constitución federal como en nuestra Constitución local. Véase, Emda. V, Const. EE. UU., LPRA, Tomo 1; Art. II, Sec. 11, Const. PR, LPRA, Tomo 1. Así pues, el derecho constitucional contra la autoincriminación constituye la protección más importante con la que cuenta todo ciudadano que enfrenta un interrogatorio como parte de una investigación criminal. Esta se activa aun en ausencia de algún indicio de coacción durante un interrogatorio. Esencialmente, se trata de que "ninguna persona está obligada a contestar preguntas ni a decir algo que lo ponga en riesgo de responsabilidad criminal". Pueblo v. Millán Pacheco, 182 DPR 595, 608 (2011).

En ese sentido, corresponde al Estado proteger el derecho de la persona contra la autoincriminación mediante la provisión de las advertencias correspondientes garantizadas por Miranda v. Arizona, 384 US 436 (1966) y

su progenie, antes de comenzar cualquier interrogatorio. Pueblo v. Millán Pacheco, supra. Por eso cuando la investigación se ha centrado en un ciudadano y este será objeto de un interrogatorio, el Estado está obligado a efectuar las advertencias siguientes: (1) que tiene el derecho a guardar silencio; (2) que cualquier expresión que haga podrá y será utilizada como evidencia en su contra; (3) que tiene derecho a consultar con un abogado de su selección antes de decidir si declara o no y contar con la asistencia de este durante el interrogatorio, y (4) que, de no tener dinero para pagar un abogado, el Estado tiene la obligación de proveérselo. Miranda v. Arizona, supra, págs 444, 475; Rivera Escuté v. Jefe Penitenciaría, 92 DPR 765 (1965). De este modo, "se promueve que el Gobierno realice sus investigaciones criminales civilizadamente y que el sistema judicial no se contamine con métodos de procurar la verdad que lesionan la dignidad humana". Pueblo v. Sustache Torres, 168 DPR 350, 354 (2006) (citando a E.L. Chiesa Aponte, Derecho procesal penal de Puerto Rico y Estados Unidos, Colombia, Ed. Forum, 1991, Vol. 1, pág. 118). Como vemos, tal protección "está inspirad[a] en los principios más trascendentales y fundamentales que subyacen en una democracia como la nuestra". Pueblo en interés menor J.A.B.C., 123 DPR 551 (1989).

Por otro lado, tal derecho constitucional es renunciable, siempre y cuando se efectúe de forma voluntaria, consciente e inteligente. Pueblo v. Millán Pacheco, supra, pág. 610. Naturalmente, el requisito de voluntariedad presupone que no puede mediar intimidación, coacción ni violencia por parte de los funcionarios del Estado. Asimismo, tal renuncia tiene que ser producto de una elección libre y deliberada. Pueblo v. Pérez Rivera, 186 DPR 845, 872 (2012); Pueblo v. Millán Pacheco, supra, pág. 611.

Al explicar el **concepto de voluntariedad, nuestro ordenamiento jurídico enfatiza que se trata de asegurarse de que la renuncia de la persona que confiesa o declara bajo interrogatorio abandona su derecho por su elección libre y deliberada, y no producto de presiones u ofertas**. Pueblo v. Millán Pacheco, supra. Además, la confesión o declaración obtenida debe ser el resultado de una renuncia en la que medie pleno conocimiento del derecho abandonado (inteligente) y de las consecuencias de ello (consciente). Íd. Para garantizar tales derechos, el Estado está obligado a transmitirle a la persona sospechosa e interrogada las aludidas advertencias y garantías de una forma eficaz. Íd.

Por consiguiente, hemos establecido que una confesión o admisión es inadmisible, por ser violatoria del derecho contra la autoincriminación, cuando se satisfacen los

requisitos siguientes: (1) que al momento de obtenerse la declaración incriminatoria la investigación se haya centralizado sobre la persona en cuestión y esta sea considerada como sospechosa de cometer un delito; (2) que al momento de efectuar la declaración el sospechoso este bajo la custodia del Estado; (3) que la declaración fue como resultado de un interrogatorio realizado con el objetivo de obtener manifestaciones incriminatorias, y (4) la ausencia de las advertencias en cuanto a los derechos constitucionales que nuestro ordenamiento provee. Pueblo v. Medina Hernández, supra; Pueblo v. López Guzmán, 131 DPR 867 (1992); Pueblo en interés menor J.A.B.C., 123 DPR 551, 561 (1989); Pueblo ex rel. F.B.M., 112 DPR 250 (1982).

Además, al evaluar si la renuncia al derecho contra la autoincriminación es válida, el juzgador deberá evaluar la totalidad de las circunstancias, entre estas, las circunstancias personales y particulares del sospechoso, el periodo de tiempo que estuvo bajo custodia policial antes de prestar la confesión, la conducta policiaca mientras estuvo bajo custodia y si efectivamente estuvo o no asistido por un abogado al confesar. Pueblo v. Medina Hernández, supra; Pueblo v. Rivera Nazario, supra; Pueblo en interés menor J.A.B.C., supra. Así, se ha dispuesto que:

> Al evaluar si la renuncia al derecho contra la autoincriminación es válida, los tribunales deben evaluar **la totalidad de las circunstancias**

**personales y particulares del sospechoso, el periodo de tiempo que estuvo bajo custodia policiaca antes de prestar la confesión, la conducta policiaca mientras estuvo bajo custodia y si efectivamente estuvo o no asistido por un abogado al confesar**. (Negrillas suplidas). <u>Pueblo v. Viruet Camacho</u>, supra, pág. 574.

Ahora bien, es al Estado a quien le corresponde probar que la confesión efectuada obedeció a una renuncia válida de las protecciones constitucionales para que dicha confesión sea admisible en evidencia. <u>Pueblo v. Medina Hernández</u>, supra, pág. 508. Para ello es preciso que se desfile prueba detallada sobre las advertencias específicas que se le hicieron al sospechoso y sobre las **condiciones imperantes en el momento en que este hizo la admisión o confesión**. Íd. Esta es la única manera en que un tribunal puede determinar, a base del criterio de la totalidad de las circunstancias, si dicha renuncia fue voluntaria, consciente e inteligente. Íd., págs. 508-09.

**B.**

Por otro lado, la Regla 22 de Procedimiento Criminal establece que una persona arrestada sin que medie una orden de arresto debe ser llevada sin demora "ante el magistrado más cercano". 34 LPRA Ap. II, R. 22. Este requisito busca que un magistrado convalide la legalidad del arresto, entiéndase, la existencia de justa causa. <u>Pueblo v. Aponte Nolasco</u>, 167 DPR 578 (2006). En el caso precitado, este Tribunal dispuso que **no deben transcurrir más de 36 horas**

**entre el arresto y la presentación de la persona ante un magistrado.** Íd. Cualquier demora en exceso de este término se presume injustificada. Íd., pág. 586. Únicamente en circunstancias excepcionales el Estado podría justificar una dilación mayor. Íd. Por lo tanto, es posible que el transcurso de un lapso de tiempo menor pudiera contravenir la referida norma. Particularmente, en casos en que no existe justificación alguna para la dilación.[1] Íd., pág. 584.

En _Pueblo v. Nieves Vives_, 188 DPR 1 (2013), este Tribunal adoptó la norma establecida en _Brown v. Illinois_, 442 US 590 (1977), de que la controversia sobre la voluntariedad de una confesión debe ser evaluada caso a caso, dependiendo de los hechos particulares. Específicamente, para determinar la admisibilidad de una confesión realizada con posterioridad a un arresto ilegal, el TPI debe ponderar los factores siguientes: (1) si se hicieron las advertencias legales; (2) el tiempo transcurrido entre el arresto ilegal y la confesión; (3) las causas interventoras, y (4) el propósito y flagrancia

---

[1]Nótese que _Aponte_ se trató del diligenciamiento de una orden de arresto emitida en ausencia. Aun así, señalamos que similar exigencia aplicaba al arresto sin orden judicial. Sin embargo, **en el caso del arresto sin una orden, la exigencia de llevar al arrestado al magistrado sin dilación innecesaria es de arraigo constitucional.** Mientras que los arrestos con una orden emitida en ausencia, la referida exigencia es puramente de carácter estatutario. (Negrillas suplidas y citas omitidas). _Pueblo v. Aponte Nolasco_, 167 DPR 578, esc. 3 (2006).

de la conducta ilegal de los funcionarios del Estado. No obstante, todos los factores deben ser considerados en conjunto, ya que ninguno es determinante por sí solo.

Evaluados los fundamentos jurídicos atinentes, veamos, entonces, los hechos que dan lugar a la controversia ante nos.

## II

El martes 25 de febrero de 2020, alrededor de las 6:00 p.m., agentes de la policía arrestaron al Sr. Pedro Marrero (señor Pedro Marrero o Recurrido) por su presunta participación en un trágico suceso familiar que desembocó en la muerte de varias personas. Su arresto se produjo sin que mediara una orden judicial. Acto seguido, los agentes Prieto Cosme y Padilla Correa lo pusieron bajo custodia, le colocaron unas esposas y le efectuaron las advertencias de rigor por considerarlo sospechoso del crimen. Ante las primeras indagaciones de los agentes, el Recurrido guardó silencio. Posteriormente, fue transportado al Cuartel Estatal de Toa Alta.

Alrededor de las 10:00 p.m., estando esposado y en el interior del referido cuartel, otra oficial del orden público, la agente Acevedo, inició otro intento de interrogarlo y le efectuó las advertencias de rigor. **En respuesta al segundo intento del Estado para obtener declaraciones incriminatorias, el señor Marrero**

**afirmativamente expresó que no renunciaría a sus derechos, razón por la cual no respondería a sus intentos de interrogarlo.** En consecuencia, a pesar de que la policía afirmó contar con motivos fundados para catalogarlo como sospechoso de un crimen, en lugar de llevarlo ante un magistrado para validar el arresto sin orden judicial, al señor Marrero se le mantuvo esposado en una celda.

A su vez, el Estado continuó investigando el caso lo que desembocó en que la agente Acevedo entrevistara a una de las hijas del señor Marrero, la Sra. Rossy Marrero Mojica (Rossy). Lo particular de esta indagación es que Rossy tenía propio y personal conocimiento de los hechos por los cuales se mantenía restricto de libertad a su padre. Al finalizar esa gestión y sin brindar razón alguna, en horas de la madrugada del miércoles, 26 de febrero de 2020, la agente Acevedo trasladó al señor Marrero desde el Cuartel Estatal de Toa Alta hacia la Comandancia de Bayamón. Nótese que, por segunda ocasión, el Estado se rehusó a presentar al detenido ante un tribunal. En cambio, optó por llevarlo a una celda de la referida Comandancia en la que permaneció esposado por el resto de la madrugada. Estando allí su padre, a la 1:00 a.m., la agente Acevedo volvió a entrevistar a Rossy. Asimismo, a las 3:20 a.m., la fiscal a cargo del caso le tomó una declaración jurada en la que esta vertió sus declaraciones sobre lo que había acontecido en la escena del crimen. Desde ese momento,

Rossy, por la naturaleza de sus declaraciones, pasó a ser considerada como testigo del caso.

A pesar de que ya tenía una testigo que presuntamente posicionaba al Recurrido en la escena del crimen, el Estado optó por dejar detenido y esposado en una celda al señor Marrero. Tras más de dieciocho (18) horas incomunicado, a eso de las 12:00 p.m., sus hijos María Milagros (Tati), José Javier y Rossy se personaron en la Comandancia de Bayamón. José Javier y Tati le llevaron comida. Por su parte, Rossy le llevó un cambio de ropa pues la policía despojó al señor Marrero de su indumentaria para fines investigativos. Según se desprende de la regrabación de la vista de supresión de evidencia y de la declaración jurada del señor Marrero, en ese momento interactuó con todos sus hijos.

Tras esa visita y la conversación con sus hijas Tati y Rossy y su hijo José Javier, a las 5:00 p.m., este le expresó a un agente que quería hablar con la fiscal a cargo del caso. En reacción, la agente Acevedo le impartió las advertencias de ley y se produjeron sus primeras declaraciones. Luego, al filo de la madrugada, el señor Marrero fue trasladado hacia el Centro Metropolitano de Investigaciones donde, tras recibir otras advertencias legales, se le tomó la declaración jurada en la cual efectuó las declaraciones aquí impugnadas. Nótese que tal declaración se efectuó tras 29 horas de detención estando

esposado y constituía el tercer intento de los oficiales públicos para compeler una declaración.

Finalmente, el jueves, 27 de febrero de 2020, a eso de las 10:55 a.m., el señor Marrero fue llevado ante un magistrado quien, fundamentado principalmente en su confesión, encontró causa para arresto. Así las cosas, el 9 de marzo de 2021, el Estado presentó siete (7) acusaciones contra el señor Marrero en las cuales le imputó varios asesinatos y violaciones a la Ley de Armas.

Tras varias incidencias procesales, el señor Marrero instó una Moción de identificación y confesión basad[a] en la[s] Regla[s] de Procedimiento Criminal mediante la cual solicitó la supresión de su identificación y de las declaraciones brindadas previamente. En lo atinente a la declaración incriminatoria, argumentó que esta debía suprimirse por motivo de que su renuncia al derecho a la no incriminación estuvo viciada por múltiples factores. Mientras, el Estado se opuso al argüir que obtuvo una confesión conforme a Derecho.

Por su parte, el Tribunal de Primera Instancia efectuó la correspondiente vista de supresión de evidencia, la cual se extendió durante cinco (5) días. Tras aquilatar la prueba documental y testifical presentada por las partes y, además, adjudicar la credibilidad de los testigos examinados, el foro primario concluyó que procedía suprimir la declaración jurada del

señor Marrero. Para arribar a tal determinación dispuso que:

> [A]l momento de la confesión el imputado estaba bajo la custodia del [E]stado como sospechoso sin orden de arresto, por un periodo de tiempo extremadamente prolongado sin justificación alguna. Que si bien es cierto que se le hicieron las advertencias de ley este había informado que no renunciaba a ninguno de sus derechos. No obstante, el [E]stado lo mantuvo detenido, lo trasladó de un cuartel a otro en la madrugada, lo mantuvo esposado, le ocupó evidencia y finalmente permitió que una de las personas que ya había prestado [una] declaración y que era testigo en su contra tuviera comunicación con él.
>
> […]
>
> Por haberse centrado la investigación sobre el acusado, la misma se ofreció en circunstancias que contravienen las protecciones constitucionales de [e]ste en cuanto al derecho contra la autoincriminación. La prueba presentada por el Ministerio Público no estableció que dicha confesión fuera hecha por el acusado de manera voluntaria, cons[c]iente e inteligentemente con pleno conocimiento de las consecuencias de la misma, ingredientes constitutivos de una renuncia válida a los derechos protegidos de todo ciudadano…[2]

Una subsiguiente moción de reconsideración del Estado fue denegada por el foro primario. Por ello, recurrió ante el Tribunal de Apelaciones mediante una <u>Petición de certiorari</u> en la que planteó que la supresión de la

---

[2]Apéndice del <u>certiorari</u>, págs. 151-152.

confesión fue una determinación errada. Insistió en que el señor Marrero renunció de forma válida a su derecho constitucional. Por su parte, el Recurrido replicó a favor de la procedencia de la supresión al argumentar que tal dictamen estuvo basado en la totalidad de las circunstancias que permearon la confesión.

El 22 de diciembre de 2022, el foro apelativo intermedio notificó una <u>Sentencia</u> y sostuvo la supresión de la confesión. Coligió con el criterio del Tribunal de Primera Instancia en cuanto a que:

> [L]a totalidad de las circunstancias, demuestran que el Estado extrajo una confesión al señor Marrero por medio de presiones ininterrumpidas de parte de funcionarios del Estado las cuales son impermisibles bajo nuestro estado de [D]erecho. Tal coacción, integrada a los elementos reseñados, compelió una confesión que violó el debido proceso de ley y el privilegio contra la autoincriminación de la Quinta Enmienda.[3]

Ante esa determinación, el Estado solicitó reconsideración, pero esta fue denegada el 11 de enero de 2023.

En desacuerdo con los dictámenes adversos de los foros recurridos, el 10 de febrero de 2023 el Estado compareció ante este Tribunal y solicitó que se revocara la supresión de la confesión del señor Marrero. Insistió en que no hubo coacción y que el tiempo en que retuvo de

---

[3] Íd., pág. 241.

forma ilegal al Recurrido es inmaterial para esta controversia. Por su parte, el señor Marrero apuntó a que las actuaciones antes narradas son representativas de una estrategia para forzar su confesión y que la retención injustificada y los continuos traslados de cuartel son ejemplos que validan su contención.

Este Tribunal expidió el recurso y hoy resuelve que procede conceder el remedio solicitado por el Estado. Al así hacerlo, pautan que el hecho de que una persona detenida no sea llevada ante un magistrado dentro del plazo de treinta y seis (36) horas es inmaterial para analizar la voluntariedad de una confesión. En ese sentido, no advierten que los dictámenes que hoy se revocan no están basados en ese solo hecho. Al contrario, están fundamentados en un análisis de la totalidad de las circunstancias fraguadas por el Estado para compeler una declaración incriminatoria. Veamos.

**III**

De entrada, conviene señalar que al señor Marrero le asistía la garantía constitucional contra la autoincriminación. Por tal razón, para evaluar si se configuró una declaración compelida inadmisible por violentar la aludida protección es menester evaluar lo siguiente: (1) si al momento de obtenerse la declaración incriminatoria la investigación estaba centralizada sobre la persona detenida por ser considerado sospechoso de

cometer un delito; (2) si al momento de efectuar la declaración estaba bajo la custodia del Estado; (3) si su declaración fue resultado de un interrogatorio realizado con el objetivo de obtener manifestaciones incriminatorias, y (4) si hubo ausencia de las advertencias en cuanto a los derechos constitucionales que nuestro ordenamiento provee.

Empero, en cuanto a lo relativo a las advertencias no basta con que se hubiesen brindado pues, de otro modo, constituiría un ejercicio pro forma. Al contrario, para que sea eficaz tal renuncia al derecho contra la no autoincriminación, es menester que esta sea voluntaria, consciente e inteligente. Como vimos, este análisis es de dos (2) pasos. Por tanto, si no se cumple el requisito de voluntariedad huelga adentrarnos en los siguientes aspectos.

Finalmente, tal ejercicio no puede realizarse sin abstraerse de las circunstancias fácticas de la situación particular. En ese sentido, el análisis de la totalidad de las circunstancias requiere sopesar si hubo presiones u ofertas para declarar, las circunstancias personales y particulares de la persona detenida, el periodo de tiempo que estuvo bajo custodia policiaca antes de prestar la confesión, la conducta policiaca mientras estuvo bajo custodia y si efectivamente estuvo o no asistido por un abogado al confesar. Corresponde entonces, aplicar estos

preceptos a la totalidad de las circunstancias en las que el señor Marrero renunció a su derecho a la no incriminación y produjo las declaraciones incriminatorias para determinar su validez.

Es un hecho incontrovertible que, al momento de obtenerse la declaración, la investigación policial estaba centralizada sobre el señor Marrero y se le consideraba sospechoso de un crimen. Por lo anterior, tampoco hay duda de que estaba bajo custodia del Estado y que las declaraciones impugnadas respondieron a un interrogatorio realizado con el objetivo de procurar manifestaciones incriminatorias. Sobre las advertencias, ciertamente, estas le fueron impartidas al Recurrido.

Sin embargo, corresponde auscultar si su renuncia a la no autoincriminación fue voluntaria, consciente e inteligente. Lo anterior hay que enmarcarlo en la totalidad de las circunstancias. Adelanto que, a mi juicio, no se cumple con el criterio de voluntariedad. **Me explico**.

Con el concepto de voluntariedad se busca asegurar que la persona que confiesa o declara bajo interrogatorio abandonó su derecho por su elección libre y deliberada y no producto de presiones u ofertas.

En la controversia ante nos, el señor Marrero estuvo sujeto a presiones del Estado desde el momento en que fue arrestado sin orden judicial. Dos (2) veces se negó a

declarar y en otras dos (2) ocasiones se le trasladó de un cuartel a otro a altas horas de la madrugada. En lugar de presentarlo ante el tribunal, el Estado prefirió mantenerlo bajo su custodia por veintinueve (29) horas en las que estuvo esposado ininterrumpidamente. Téngase presente que el señor Marrero es una persona de setenta y siete (77) años, con un bajo nivel de escolaridad y con una situación económica apremiante. Más importante aún, de sus circunstancias particulares se desprende que, el día de los presuntos sucesos, este estuvo presentándose ante un tribunal para ventilar una acción civil relativa a una disputa familiar por un inmueble. Súmele que según surge del expediente, este manifestó que en el cuartel de Toa Alta los agentes del orden público lo hostigaron y trataron mal. Además, que permaneció esposado en una celda, que se le privó de su ropa y estuvo más de diecisiete (17) horas incomunicado de su familia, cuando por fin interactuó con su hija, quien ya en ese momento era testigo en el caso. Todo esto ocurrió sin la presencia de un abogado.

Como vemos, a la luz de la totalidad de estas circunstancias no podemos concluir que tal renuncia fue una voluntaria. De hecho, el foro primario, quien estuvo en contacto con la prueba testifical, al cabo de cinco (5) días de vistas arribó a similar conclusión. Me reitero en que no procedía revocar tal dictamen.

Finalmente, discrepo de la aseveración en la Opinión de este Tribunal en cuanto a que no estamos frente una detención ilegal por parte del Estado y que el hecho de que una persona detenida no sea llevada ante un magistrado dentro del plazo de treinta y seis (36) horas es inmaterial para analizar la voluntariedad de una confesión.

Considero que, habida cuenta de que el señor Marrero estuvo detenido por más tiempo de lo que, como cuestión de Derecho, es permitido en casos en arrestos sin orden judicial, provoca que estemos frente a una detención ilegal que flagela su debido proceso de ley. Ello adquiere mayor importancia puesto que en Aponte Nolasco, supra, este Tribunal expresó que, en el caso del arresto sin una orden, la exigencia de llevar al arrestado al magistrado sin dilación innecesaria es de raigambre constitucional. De hecho, el Estado nunca ha propuesto una interpretación razonable creíble para justificar tal tardanza.

Por tanto, estando frente a una detención ilegal, procede aplicar los criterios de Pueblo v. Nieves Vives, supra, para sopesar la voluntariedad de la confesión. En primer lugar, vimos que aunque se brindaron las advertencias legales, estas carecen de validez por estar ausente el elemento de voluntariedad. Segundo, valga resaltar que transcurrió un lapso de veintinueve (29) horas entre el arresto y la confesión viciada. A su vez, en total el señor Marrero estuvo detenido sin ser

presentado ante un tribunal por un espacio de cuarenta (40) horas. Tercero, aquí no cabe hablar de causas interventoras que vayan a favor de sostener la voluntariedad de la confesión. Todo lo contrario, la interacción que tuvo el señor Marrero con su familia fue de corta duración y aunque hay controversia sobre si Rossy -quien era testigo del caso- habló con su papá, lo cierto es que el foro primario no le adjudicó credibilidad a la aseveración de la agente Acevedo a los efectos de que esta no se comunicó con este. Por último, del cuadro fáctico que hemos reseñado queda de manifiesto la conducta antijurídica del Estado para procurar una declaración incriminatoria por parte del señor Marrero.

Toda vez que la Opinión que hoy se emite revoca unos dictámenes que correctamente reflejan la totalidad de las circunstancias mediante las cuales el Estado obtuvo una confesión ilegal, no me queda más que distanciarme del curso de acción adoptado por este Tribunal y disentir.


                                Luis F. Estrella Martínez
                                    Juez Asociado